# IN THE SUPREME COURT OF IOWA

No. 15–1408

Filed March 23, 2018

**JACOB LEE SCHMIDT,**

Appellant,

vs.

**STATE OF IOWA,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Woodbury County, Edward A. Jacobson, Judge.

A defendant seeks further review of a court of appeals decision affirming summary dismissal/summary judgment of his postconviction-relief action. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Mark C. Smith, State Appellate Defender, and Martha J. Lucey, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Sheryl Soich, Assistant Attorney General, for appellee.

Erica A. Nichols Cook of the State Public Defender's Office, Des Moines, for amicus curiae Exoneration Project at the University of Chicago Law School.

Lance W. Lange, Jesse Linebaugh, and Mitch G. Nass of Faegre Baker Daniels, LLP, Des Moines, for amici curiae The Innocence Network and The Innocence Project of Iowa.

**WIGGINS, Justice.**

An applicant filed a postconviction-relief action claiming he was actually innocent although he knowingly and voluntarily pled guilty to the charged crimes. He based his actual-innocence claim on a recantation by the victim. The district court granted the State's motion for summary dismissal/summary judgment, ruling the applicant cannot use the recantation to attack his knowing and voluntary guilty pleas because the recantation was extrinsic to the pleas. The applicant appealed, and we transferred the case to our court of appeals. The court of appeals affirmed. The applicant sought further review, which we granted.

On further review, we overrule our cases holding that defendants may only attack the intrinsic nature—the voluntary and intelligent character—of their pleas. We now hold the Iowa Constitution allows freestanding claims of actual innocence, so applicants may bring such claims to attack their pleas even though they entered their pleas knowingly and voluntarily. Accordingly, we adopt a freestanding claim of actual innocence that applicants may bring under our postconviction-relief statute.[1] Therefore, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case to the district court for further consideration consistent with this opinion.

## I. Background Facts and Proceedings.

On December 19, 2006, the State filed a trial information charging Jacob Lee Schmidt with sexual abuse in the third degree in violation of

---

[1]We do not think *Class v. United States*, 583 U.S. ___, 138 S. Ct. 798 (2018), affects our decision today. In that case, the United States Supreme Court held a guilty plea does not bar a federal criminal defendant from challenging on direct appeal the constitutionality of the statute of conviction. *Id.* at ___, 138 S. Ct. at 803–05. Our decision involves an actual-innocence claim under the Iowa Constitution based on newly discovered evidence.

Iowa Code section 709.4(1) (2005). On March 23, 2007, the State moved to amend the trial information to charge Schmidt with two additional counts of sexual abuse in the third degree in violation of section 709.4(2)(*b*) (counts II and III) and one count of incest in violation of section 726.2 (count IV). The district court granted the motion.

The minutes of testimony attached to the original trial information and the police offense report reveal that witnesses would provide the following testimony. On February 25, 2006, Schmidt, then age seventeen, visited the home of his stepfather, Peter, and his newly turned fourteen-year-old half-brother, B.C., with whom Schmidt shares the same mother. Peter is B.C.'s father. Peter left Schmidt and B.C. alone at the house to visit his girlfriend. Upon Peter's departure, Schmidt ordered B.C. into the bedroom and forced him to get on his knees on the mattress with his pants down. B.C. complied. Schmidt then removed his own pants, got on his knees behind B.C., and attempted anal sex.

Peter realized he had forgotten his cigarettes and went back home to retrieve them. Once inside, he saw neither Schmidt nor B.C. in the living room, where they had been up until his departure. Peter thought this was strange, so he looked around the home and eventually opened the bedroom door and saw Schmidt attempting to penetrate B.C. anally. Peter yelled, "What the hell are you doing!" and told Schmidt to "get the hell out of the house." Schmidt left the house, and Peter called the police.

Officers Todd Ferry and Kevin Heineman responded. Officer Ferry took Peter out to the squad car to interview him while Officer Heineman spoke to B.C. inside the home. Because Peter could not write or spell well, Officer Ferry used the in-car camera to record Peter's interview.

Meanwhile, B.C. recounted what had happened to Officer Heineman. B.C. stated he was "not afraid," and Schmidt had only threatened him on a previous occasion when Schmidt actually penetrated him approximately two or three months ago. Schmidt had told B.C. not to tell anyone unless B.C. wanted to get hurt. B.C. defined "penetrate" as "when he actually went inside his anal area." B.C. stated he was "positive" Schmidt did not penetrate him this time and "no part of his body hurt." All B.C. wanted was for the police to arrest Schmidt. Officer Heineman asked B.C. to fill out a witness statement and realized B.C. had difficulty with spelling and writing. Officer Heineman did not have B.C. continue writing the witness statement after B.C. had written three or four words.

Peter's home landline phone rang, and Officer Heineman answered it. Shanna, Schmidt and B.C.'s mother, was on the other end of the phone. She stated Schmidt had come to her home and she was going to take him to Mercy Hospital because he was having suicidal thoughts. At the hospital, Shanna advised Officer Ferry that Schmidt said Peter was lying about the whole incident.

Officer Christopher Groves followed up on the case. He asked to interview Schmidt who declined on the advice of his lawyer. Officer Groves described B.C. as "lower functioning" and stated he did not interview him because it was "very evident" he could "lead him [to] answers." Officer Groves thus scheduled B.C. for an interview with the Child Advocacy Center, which conducted a videotaped interview on March 2.

During the March 2 interview, B.C. told the interviewer "[Schmidt] tried to molest him." B.C. stated Schmidt had penetrated him on at least one occasion, and "it hurt and he tried to escape." He was thirteen at the

time. B.C. stated he had sucked Schmidt's penis before but could not say how many times this occurred.

On April 2, 2007, Schmidt entered into a plea agreement. He agreed to plead guilty to assault with intent to commit sexual abuse, an aggravated misdemeanor in violation of Iowa Code section 709.11 (amended count I) and incest (count IV). The State agreed to dismiss the two other counts of sexual abuse in the third degree (counts II and III) given the district court sentenced Schmidt according to the plea agreement.

That same day, during the combined plea and sentencing hearing, the court reviewed the consequences of pleading guilty with Schmidt. Schmidt informed the court he understood the rights he was giving up and wished to plead guilty to the charges. Schmidt acknowledged the minutes of testimony accurately described what he did. The court reviewed the factual basis for each count, and Schmidt confirmed he understood. The court accepted Schmidt's pleas and convicted him of assault with intent to commit sexual abuse and incest. Pursuant to the plea agreement, the court entered sentences of incarceration to run consecutively for a total term not to exceed seven years. Schmidt did not appeal this decision.

On June 23, 2014, Schmidt filed an application for postconviction relief under Iowa Code section 822.2(1)(*d*) (2014). In support of his application, he contended B.C. recanted his story by "com[ing] forward with the truth." Schmidt further claimed, "I was not guilty. I was scared so I pled guilty [be]cause I was fac[ing] over [fifty] years." Schmidt alleged the victim's recantation was new evidence supporting postconviction relief. In its answer, the State denied "each and every ground for postconviction relief."

On May 14, 2015, the State filed a motion for summary dismissal/summary judgment, making two arguments. First, the State argued the three-year statute of limitations pursuant to Iowa Code section 822.3 procedurally barred Schmidt's postconviction-relief application.

Second, on the merits, the State asserted Schmidt's "application [was] in direct contradiction to the record as well as in direct contradiction to his voluntary and knowing plea[s] of guilty." It claimed Schmidt pled guilty after an extensive colloquy, knowing his involvement or noninvolvement in the alleged sexual act and the evidence against him.

On May 28, Schmidt filed a resistance, arguing B.C.'s recantation was "new evidence [that] prevented earlier filing [of his postconviction-relief application] and [that] establishes actual innocence." Schmidt included B.C.'s affidavit. In his affidavit, B.C. stated under oath,

> When I was 21 years old, I told other people that [Schmidt] had never touched me in a sexual way or sexually abused me. I didn't tell anyone before that date that nothing had really happened, and so [Schmidt] couldn't have known before then. I decided to tell people when I turned 21 since I was a full adult at that time.

On July 30, the district court granted the State's motion for summary dismissal/summary judgment. It did not rule on the statute of limitations. Rather, relying on an unpublished court of appeals decision, it stated that "newly discovered exculpatory evidence does not provide grounds to withdraw a guilty plea unless intrinsic to the plea itself." In other words, the court decided Schmidt waived his claim of actual innocence by pleading guilty. Schmidt appealed.

We transferred the case to the court of appeals. Affirming the district court's grant of summary dismissal/summary judgment, the

court of appeals reasoned the alleged recantation was not intrinsic to Schmidt's guilty pleas. It therefore concluded, "[B]ecause Schmidt's convictions were entered following his guilty pleas, he cannot challenge those convictions in a [postconviction-relief] action on the basis of newly discovered evidence in the form of his alleged victim's recantation." Schmidt filed an application for further review, which we granted.

## II. Scope of Review.

"[T]he principles underlying [a] summary judgment procedure apply to motions of either party for disposition of an application for postconviction relief without a trial on the merits." *Manning v. State*, 654 N.W.2d 555, 560 (Iowa 2002). In other words, for a summary disposition to be proper, the State must be able to prevail as if it were filing a motion for summary judgment in a civil proceeding. *Castro v. State*, 795 N.W.2d 789, 793 (Iowa 2011) ("The standards for summary judgment in postconviction[-]relief actions are analogous to summary judgment in civil proceedings.").

We review summary dismissals of postconviction-relief applications for errors at law. *Id.* at 792. Applying summary judgment principles, summary disposition is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show . . . there is no genuine issue of material fact and . . . the moving party is entitled to a judgment as a matter of law." *Davis v. State*, 520 N.W.2d 319, 321 (Iowa 1994) (quoting Iowa R. Civ. P. 237(c), now r. 1.981(3)). The moving party bears the burden of showing that no material fact exists. *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 73 (Iowa 2011). We view the record in the light most favorable to the nonmoving party. *Eggiman v. Self-Insured Servs. Co.*, 718 N.W.2d 754, 758 (Iowa 2006). We also draw all legitimate inferences from the

evidence in favor of the nonmoving party. *C & J Vantage,* 795 N.W.2d at 73.

**III. Analysis.**

**A. Whether Schmidt's Guilty Pleas Preclude Him from Pursuing His Actual-Innocence Claim.** The broad issue we must decide is whether Schmidt's pleas preclude him from pursuing a postconviction-relief action. The narrow issue we must address is whether Schmidt's pleas preclude him from bringing his actual-innocence claim because such a challenge is extrinsic to his pleas.

Under our current law,

> [w]hen a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea . . . .

*State v. Utter,* 803 N.W.2d 647, 651 (Iowa 2011) (alteration in original) (quoting *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S. Ct. 1602, 1608 (1973)). It is on this basis the district court dismissed and the court of appeals affirmed the dismissal of Schmidt's postconviction-relief action. The time has come to reevaluate this law in regards to an actual-innocence claim. We now turn to the first issue and begin our analysis by examining our postconviction-relief statute.

Iowa Code section 822.2 provides, "Any person who has been convicted of, or sentenced for, a public offense and who claims any of the following may institute, without paying a filing fee, a proceeding under this chapter to secure relief." Iowa Code § 822.2(1).

We have previously discussed the meaning of the term "conviction" under section 822.2 in *Daughenbaugh v. State*, 805 N.W.2d 591, 597–99 (Iowa 2011). There we said,

> We begin our discussion of Iowa law by examining our approach to statutory interpretation of the term "conviction." Like many other jurisdictions, we have emphasized that "conviction" has an "equivocal meaning" that depends upon the context in which it is used. Like many other states, we have said that, when the word is used in its general and popular sense, conviction means the establishment of guilt independent of judgment and sentence. On the other hand, when the term "conviction" is used in its technical legal sense, it requires a formal adjudication by the court and the formal entry of a judgment of conviction.

*Id.* at 597 (citations omitted). We then stated our postconviction statute uses the word conviction in its " 'strict legal sense' and not in its broader popular context." *Id.* at 598–99. Thus, the technical legal sense of the word conviction requires adjudication of guilt and the entry of a judgment. *Id.* at 599.

In another case, we stated the acceptance by the court of a defendant's plea "constitutes a conviction of the highest order" and authorizes the court to sentence the defendant as though the factfinder returned a guilty verdict. *State v. Kobrock*, 213 N.W.2d 481, 483 (Iowa 1973). That is what happened here: Schmidt entered his pleas, the court accepted his pleas, and sentenced him accordingly. In doing so, the court adjudicated him guilty and entered judgment. Adjudication and entry of judgment constitute conviction, and conviction is a requirement for filing a postconviction-relief action under section 822.2. *See Daughenbaugh*, 805 N.W.2d at 599. Thus, Schmidt's pleas do not preclude him from filing a postconviction-relief action.

The second issue is whether Schmidt faces any other barriers to filing his postconviction-relief action after pleading guilty. Specifically, the issue is whether Schmidt may attack his pleas by bringing an actual-innocence claim even though such a challenge is extrinsic to his pleas. First, we discuss the current state of our caselaw regarding challenges to pleas. Second, we examine the implication of *State v. Alexander*, 463 N.W.2d 421 (Iowa 1990), on the possibility of challenging a plea in a postconviction-relief action based on newly discovered evidence. Third, we discuss the phenomenon of pleading guilty despite actual innocence. Lastly, we examine our legislature's codification of section 81.10, which allows postconviction-DNA testing.

A valid plea "waive[s] all defenses and the right to contest all adverse pretrial rulings." *State v. Morehouse*, 316 N.W.2d 884, 885 (Iowa 1982), *overruled on other grounds by State v. Kress*, 636 N.W.2d 12, 20 (Iowa 2001). However, the defendant may attack his or her plea when the plea itself contains intrinsic irregularities or the trial information charges no offense. *See State v. Mattly*, 513 N.W.2d 739, 740–41 (Iowa 1994); *Morehouse*, 316 N.W.2d at 885.

We fashioned the general rule precluding extrinsic challenges to pleas on the premise that "[a] defendant plead[s] guilty in open court, with assistance of counsel, knowingly and understandingly." *State v. Delano*, 161 N.W.2d 66, 73 (Iowa 1968). Thus, the defendant waives his or her rights "with respect to conduct of criminal prosecution and any objection to prior proceedings which may include a violation of his [or her] rights." *Id.* This waiver could preclude certain postconviction-relief actions under section 822.2(1)(*a*), which provides relief for a "conviction or sentence [that] was in violation of the Constitution of the United States or the Constitution or laws of this state." Iowa Code § 822.2(1)(*a*).

It does not preclude relief under section 822.2(1)(*d*), which provides relief when "[t]here exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice." *Id.* § 822.2(1)(*d*); *accord Alexander*, 463 N.W.2d at 423 (referring to Iowa Code section 663A.2(4) (1989), now codified at section 822.2(1)(*d*) (2014)).

In *Alexander*, the defendant pled guilty to going armed with a dangerous weapon. 463 N.W.2d at 421. After his plea and sentencing, the defendant filed a motion for new trial based on newly discovered evidence in the form of witness testimony supporting a theory of justification or self-defense. *Id.* at 422. We examined then rule 23(2)(a) of our rules of criminal procedure. That rule stated,

> The application for a new trial . . . shall be made not later than forty-five days after *plea of guilty* [or] verdict of guilty, . . . but in any case not later than five days before the date set for pronouncing judgment, *but where based upon newly discovered evidence may be made after judgment as well.*

*Id.* (quoting Iowa R. Crim. P. 23(2)(a), now r. 2.24(2)(a) (emphasis added)).

We reasoned "[l]ogic would suggest that the concept of *new* trial should have as its predicate the existence of a *former* trial." *Id.* Based on the legislative history, we then concluded inclusion of the phrase "plea of guilty" in rule 23(2)(a) was inadvertent and erroneous, and therefore held rule 23(2)(a) as written did not allow for a new trial following a guilty plea. *Id.* at 422–23. We buttressed this conclusion by stating,

> We are confident that the legislature did not intend to give admittedly guilty persons the unfettered right to recant their admission and proceed to trial on the ground of newly discovered evidence or any other ground not intrinsic to the plea.

*Id.* at 423.

We reasoned "[n]otions of newly discovered evidence simply have no bearing on a knowing and voluntary admission of guilt." *Id.* However, we noted the defendant was not without a remedy. *Id.* We stated the remedy the defendant sought was available under Iowa Code section 663A.2(4) (1989), now codified at section 822.2(1)(*d*) (2014), when challenging his plea based on newly discovered evidence. *Id.* Thus, in *Alexander*, we left the door open for challenging a plea in a postconviction-relief action based on newly discovered evidence.

We now examine the phenomenon of actually innocent people pleading guilty. The National Registry of Exonerations reported that seventy-four exonerations in 2016 arose from pleas. The National Registry of Exonerations, *Exonerations in 2016* 2 (2017), www.law.umich.edu/special/exoneration/Documents/Exonerations_in_2 016.pdf.

We have stated "criminal cases in general, and guilty pleas in particular, are characterized by considerable uncertainty[.]" *State v. Carroll*, 767 N.W.2d 638, 642 (Iowa 2009).

> [T]he decision to plead guilty before the evidence is in frequently involves the making of difficult judgments. All the pertinent facts normally cannot be known unless witnesses are examined and cross-examined in court. Even then the truth will often be in dispute. In the face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the State's case. Counsel must predict how the facts, as he understands them, would be viewed by a court. If proved, would those facts convince a judge or jury of the defendant's guilt? On those facts would evidence seized without a warrant be admissible? Would the trier of fact on those facts find a confession voluntary and admissible? Questions like these cannot be answered with certitude; yet a decision to plead guilty must necessarily rest upon counsel's answers, uncertain as they may be. Waiving trial entails the inherent risk that the good-faith evaluations

> of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts.

*Id.* (quoting *McMann v. Richardson,* 397 U.S. 759, 769–70, 90 S. Ct. 1441, 1448 (1970)).

Pleading guilty despite actual innocence is not limited to uncertainty. One of our recent cases recognizes that actually innocent people plead guilty for many different reasons. *See Rhoades v. State,* 880 N.W.2d 431, 436–38 (Iowa 2016).

People have been known to confess to crimes they did not commit during police interrogations[2] and such confessions bleed into their decisions to plead guilty. "A false coerced confession may undermine the accuracy of a guilty plea . . . ." Kevin C. McMunigal, *Guilty Pleas,* Brady *Disclosure, and Wrongful Convictions,* 57 Case W. Res. L. Rev. 651, 656 (2007). Because such a confession increases the chances of conviction at trial, defendants face pressure to plead guilty even when they are actually innocent. *Id.*; *see also* Rodney Uphoff, *Convicting the Innocent: Aberration or Systemic Problem?,* 2006 Wis. L. Rev. 739, 796 (2006) [hereinafter Uphoff] ("The difficulty of overcoming so-called confessions and of successfully attacking a positive eyewitness identification are just two of a host of factors that may push a defendant into a guilty plea regardless of his or her actual innocence.").

Moreover, innocent defendants plead guilty for reduced charges and shorter sentences. Rachel E. Barkow, *Separation of Powers and the Criminal Law,* 58 Stan. L. Rev. 989, 1034 (2006) [hereinafter Barkow];

---

[2]A number of factors contribute to a false confession, such as "duress," "coercion," "intoxication," "diminished capacity," "mental impairment," "ignorance of the law," "fear of violence," "the actual infliction of harm," "the threat of a harsh sentence," [and] "misunderstanding the situation." Innocence Project, *False Confessions or Admissions,* https://www.innocenceproject.org/causes/false-confessions-admissions/ [https://perma.cc/66JM-T4L9].

*see also* Robert E. Scott & William J. Stuntz, *Plea Bargaining as Contract*, 101 Yale L.J. 1909, 1912 (1992) [hereinafter Scott & Stuntz] ("Defendants accept bargains because of the threat of much harsher penalties after trial; they are thus forced to give up the protections that the trial system's many formalities provide."). The reality of plea bargaining is that "[defendants] who do take their case to trial and lose receive longer sentences than even Congress or the prosecutor might think appropriate, because the longer sentences exist on the books largely for bargaining purposes." Barkow, 58 Stan. L. Rev. at 1034.

Simply put, in economic terms, defendants engage in a cost–benefit analysis. Entering into a plea agreement is not only rational but also more attractive than dealing with the uncertainty of the trial process and the possibility of harsher sentences. Indeed, "even with competent counsel, going to trial can be incredibly risky business." Uphoff, 2006 Wis. L. Rev. at 799. We stated in *Rhoades* that "[w]hen the deal is good enough, it is rational to refuse to roll the dice, regardless of whether one believes the evidence establishes guilt beyond a reasonable doubt, and regardless of whether one is factually innocent." 880 N.W.2d at 436–37 (alteration in original) (quoting Russell D. Covey, *Longitudinal Guilt: Repeat Offenders, Plea Bargaining, and the Variable Standard of Proof*, 63 Fla. L. Rev. 431, 450 (2011)); *accord* Jed S. Rakoff, *Why Innocent People Plead Guilty,* N.Y. Rev. Books (Nov. 20, 2014), www.nybooks.com/articles/2014/11/20/why-innocent-people-plead-guilty/ [https://perma.cc/LT8T-XKAV] ("If [the defendant's] lawyer can obtain a plea bargain that will reduce his likely time in prison, he may find it 'rational' to take the plea.").

A plea does not weed out the innocent. Rather, a plea is an explicit agreement[3] between the prosecutor and the defendant that "establishes a 'going rate.'" John L. Kane, *Plea Bargaining and the Innocent*, The Marshall Project (Dec. 26, 2014, 1:05 PM), https://www.themarshallproject.org/2014/12/26/plea-bargaining-and-the-innocent [https://perma.cc/R5FU-Y3T4]. Specifically, "[t]he anticipated sentence is the central concern in the negotiation[,]" but "[t]he problem . . . is that both innocent and guilty defendants are placed in the same pot and the goal is to achieve the appearance of justice, not the realization of it." *Id.*; *see also Missouri v. Frye*, 566 U.S. 134, 144, 132 S. Ct. 1399, 1407 (2012) ("In today's criminal justice system . . . the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant."). Pleading guilty does not automatically mean the defendant is *actually* guilty. Sometimes, an innocent defendant is choosing the lesser of two evils: pleading guilty despite his or her actual innocence because the odds are stacked up against him or her, or going to trial with the risk of losing and the prospect of receiving a harsher sentence.

Innocent defendants may also plead guilty in the face of pressure from prosecutors and even their own defense counsels. Today, "our criminal justice system is almost exclusively a system of plea bargaining, negotiated behind closed doors and with no judicial oversight." Jed S. Rakoff, *Why Innocent People Plead Guilty*, N.Y. Rev. Books (Nov. 20, 2014). Behind these closed doors, prosecutors have broad discretion: "the prosecutor-dictated plea bargain system, by creating such inordinate pressures to enter into plea bargains, appears to have led a

---

[3]Two scholars have gone as far to describe the plea bargaining process as "horse trading." Scott & Stuntz, 101 Yale L.J. at 1912.

significant number of defendants to plead guilty to crimes they never actually committed." *Id.*; *see also* Innocence Project, *Why Are People Pleading Guilty to Crimes They Didn't Commit?* (Nov. 25, 2015), https://www.innocenceproject.org/why-are-people-pleading-guilty-to-crimes-they-didnt-commit/ [https://perma.cc/3CEX-WEW2].

H. Lee Sarokin, a former federal judge, described the plea bargaining process as involving "intimidation by the prosecution and incompetence by the defense." H. Lee Sarokin, *Why Do Innocent People Plead Guilty?*, HuffPost (May 29, 2012, 4:39 PM), https://www.huffingtonpost.com/judge-h-lee-sarokin/innocent-people-guilty-pleas_b_1553239.html [https://perma.cc/6PSQ-6QW4]. He illustrated,

> The defendant, frightened, most often poor, uneducated, a minority member is advised that a trial is likely to end with a conviction and a long sentence, whereas a plea will guarantee a much shorter sentence. Despite his protestations of innocence, the defendant seeks guidance frequently from an over-worked, underpaid defense lawyer who would much prefer a quick deal rather than a long drawn out trial. Of course, not all defense counsel fit that description. Many do not, but even the best and most devoted are required to put this draconian choice to their clients—a guaranteed short sentence versus a potentially long one—possibly life in prison.

*Id.* We again emphasize the prosecutor's promise of a shorter sentence is more attractive than going to trial and possibly losing. Defendants, even those who are actually innocent and especially those who are indigent, have more to lose by going to trial than by pleading guilty.

Finally, we review the current legislative policy regarding guilty pleas and actual innocence. In 2005, in passing Iowa Code section 81.10, the legislature recognized a person who pleads guilty could be actually innocent. *See* 2005 Iowa Acts ch. 158, § 10 (codified at Iowa

Code § 81.10). Section 81.10 allows a convicted defendant to make a motion that, if granted, would require DNA testing "on evidence collected in the case for which the person stands convicted." Iowa Code § 81.10 (2014). The motion must state the following:

> *b.* The facts of the underlying case, as proven at trial or admitted to during a *guilty plea proceeding.*
>
> . . . .
>
> *h.* The type of inculpatory evidence admitted into evidence at trial or admitted to during a *guilty plea proceeding.*
>
> . . . .
>
> *l.* Why the DNA evidence would have changed the outcome of the trial or invalidated a *guilty plea* if DNA profiling had been conducted prior to the conviction.

*Id.* § 81.10(2)(*b*), (*h*), and (*l*) (emphases added).

After the convicted defendant files the motion and the county attorney files an answer to the motion, the court may order a hearing on the motion. *Id.* § 81.10(3), (6). The court must grant the motion if all of the requirements of section 81.10(7) apply. One of the requirements recognizes the applicability of DNA exoneration to pleas. *Id.* § 81.10(7)(*d*). Section 81.10(7)(*d*) provides, "The evidence subject to DNA analysis is material to, and not merely cumulative or impeaching of, evidence included in the trial record or admitted to at a *guilty plea proceeding.*" *Id.* (emphasis added). This legislation reaffirms the fact that even actually innocent persons do in fact plead guilty and should have a chance for exoneration.

In light of these recent developments, we hold convicted defendants can attack their pleas when claiming actual innocence even if the attack is extrinsic to the pleas. We know people plead guilty for all

sorts of reasons. Many of these reasons are unrelated to whether the defendant actually committed the crime. Additionally, the legislature has set the policy that the state should not incarcerate actually innocent people if DNA evidence exonerates them, regardless of their pleas. We see no reason why we should treat people exonerated by DNA evidence differently from people exonerated by other reliable means. For example, when the court determines the police planted evidence, such as drugs, why should that defendant remain in prison simply because he or she pled guilty to a reduced charge in light of the overwhelming evidence of his or her guilt?

What kind of system of justice do we have if we permit actually innocent people to remain in prison? *See Engesser v. Young*, 856 N.W.2d 471, 484 (S.D. 2014) ("Punishment of the innocent may be the worst of all injustices." (quoting *Jenner v. Dooley*, 590 N.W.2d 463, 471 (S.D. 1999))); *see also In re Kaufmann*, 157 N.E. 730, 733 (N.Y. 1927) (noting that in circumstances in which a convicted individual establishes his innocence, "the administration of justice would be subject to reproach if an implacable law of remedies were to close the door forever upon the hope of vindication").[4] It is time that we refuse to perpetuate a system of justice that allows actually innocent people to remain in prison, even those who profess guilt despite their actual innocence.

Accordingly, we overrule our cases that do not allow defendants to attack their pleas based on extrinsic grounds when they claim actual

---

[4]We acknowledge these two cases involved defendants who went to trial. We discuss this distinction later in the opinion. In any event, we believe the principles reflected in *Engesser* and *In re Kaufmann* apply equally to defendants who claim actual innocence following trial and those who claim actual innocence following a guilty plea proceeding.

innocence. Therefore, we hold Schmidt's pleas do not preclude his actual-innocence claim merely because he pled guilty to the charges.

**B. An Actual-Innocence Claim Under Iowa Law.** We have never addressed whether, under our postconviction-relief statute, a claim of actual innocence constitutes a gateway claim or a freestanding claim implicating the Iowa Constitution. Additionally, we have neither discussed the standard courts must apply when confronted with actual-innocence claims nor the vehicle defendants may use to bring such claims.

1. *Freestanding claim versus gateway claim.* In the federal system, a habeas petitioner may overcome a procedural bar to habeas review by bringing a gateway claim of actual innocence such that the petitioner may obtain review of the underlying constitutional merits of his or her procedurally defaulted claim. *Herrera v. Collins*, 506 U.S. 390, 404, 113 S. Ct. 853, 862 (1993); *see also In re Davis*, 557 U.S. 952, 955, 130 S. Ct. 1, 3 (2009) (Scalia, J., dissenting). "Federal habeas review of state convictions has traditionally been limited to claims of constitutional violations occurring in the course of the underlying state criminal proceedings." *Herrera*, 506 U.S. at 416, 113 S. Ct. at 869. The United States Supreme Court has declined to stretch the reach of federal habeas review to freestanding claims of actual innocence when there is a state avenue to provide for pardons. *Montoya v. Ulibarri*, 163 P.3d 476, 482 (N.M. 2007); *People v. Cole*, 765 N.Y.S.2d 477, 484 (Sup. Ct. 2003).

To overcome a procedural bar to federal habeas review, a petitioner must generally show "cause for the default and prejudice from the asserted error." *House v. Bell*, 547 U.S. 518, 536, 126 S. Ct. 2064, 2076 (2006). "Cause" turns on the question of "whether the prisoner can show that some objective factor external to the defense impeded counsel's

efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986). The United States Supreme Court has vaguely defined "prejudice" but "prejudice" at least entails an "actual prejudice" standard that requires a showing that "is 'greater than the showing required to establish plain error on direct appeal.'" *Engle v. Isaac*, 456 U.S. 107, 134–35, 102 S. Ct. 1558, 1575 (1982) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S. Ct. 1730, 1736–37 (1977)).

> Absent the showing of cause and prejudice,
>
> a court may not reach the merits of: (a) *successive claims* that raise grounds identical to grounds heard and decided on the merits in a previous petition, . . . ; (b) new claims, not previously raised, which constitute an *abuse of the writ*, . . . ; or (c) *procedurally defaulted claims* in which the petitioner failed to follow applicable state procedural rules in raising the claims[.]

*Sawyer v. Whitley*, 505 U.S. 333, 338, 112 S. Ct. 2514, 2518 (1992) (citations omitted).

The procedural default doctrine arises from the principles of comity and finality, and the conservation of judicial resources. *House*, 547 U.S. at 536, 126 S. Ct. at 2076. However, in certain circumstances, such principles "must yield to the imperative of correcting a fundamentally unjust incarceration." *Id.* (quoting *Carrier*, 477 U.S. at 495, 106 S. Ct. at 2649); *see Kuhlmann v. Wilson*, 477 U.S 436, 454, 106 S. Ct. 2616, 2627 (1986) (holding the miscarriage-of-justice exception allows successive claims given the petitioner shows "under the probative evidence he has a colorable claim of factual innocence"); *Carrier*, 477 U.S. at 496, 106 S. Ct. at 2649 (holding "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent," the merits of a procedurally defaulted claim could be reached).

For purposes of this appeal, we focus on the fundamental-miscarriage-of-justice, or actual-innocence, exception.

In *Schlup v. Delo*, in considering a petitioner's actual-innocence claim accompanied by an assertion of constitutional violations at trial, the Supreme Court explained what constitutes a gateway claim and articulated the gateway standard. 513 U.S. 298, 315–17, 326–27, 115 S. Ct. 851, 861–62, 867 (1995). The Court defined the petitioner's gateway claim of actual innocence as "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315, 115 S. Ct. at 861 (quoting *Herrera*, 506 U.S. at 404, 113 S. Ct. at 862). In other words, the petitioner's claim of actual innocence does not alone provide a basis for a court to vacate his conviction. *See id.* Rather, his claim of actual innocence depends on the validity of his underlying constitutional claims. *See id.*

*Schlup* held a petitioner asserting a gateway claim must demonstrate that in light of all the evidence, including the new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327, 115 S. Ct. at 867 (adopting "the *Carrier* 'probably resulted' standard"); *accord Kenfield v. State*, 377 P.3d 1207, 1211–12 (Mont. 2016); *Berry v. State*, 363 P.3d 1148, 1155 (Nev. 2015); *In re Personal Restraint of Weber*, 284 P.3d 734, 740 (Wash. 2012) (en banc). This more-likely-than-not standard "ensures that petitioner's case is truly 'extraordinary,' . . . while still providing petitioner a meaningful avenue by which to avoid a manifest injustice." *Schlup*, 513 U.S. at 327, 115 S. Ct. at 867 (quoting *McCluskey v. Zant*, 499 U.S. 467, 494, 111 S. Ct. 1454, 1470 (1991)). The petitioner does not need to establish with absolute certainty that he

or she is innocent. *House*, 547 U.S. at 538, 126 S. Ct. at 2077. In declining to adopt a clear and convincing standard, the Court stated that actual-innocence claims "pose less of a threat to scarce judicial resources and to principles of finality and comity than do claims that focus solely on the erroneous imposition of the death penalty." *Schlup*, 513 U.S. at 324, 115 S. Ct. at 865.

Based on the foregoing, we carefully distinguish between the two forms of an actual-innocence claim: a gateway claim of actual innocence with an underlying constitutional challenge and a freestanding claim of actual innocence that is itself the substantive basis for relief.

2. *Freestanding claims of actual innocence in Iowa.* Schmidt argues the "in the interest of justice" language of Iowa Code section 822.2(1)(*d*), unlike federal habeas, gives a substantive basis for actual-innocence claims. Schmidt states section 822.2(1)(*a*) also provides a means to raise a freestanding claim of actual innocence because "[i]f a person is convicted of a crime he did not commit[,] such a conviction violates the Iowa Constitution." Thus, Schmidt contends, because his claim of actual innocence is itself a substantive claim, it does not need to pass through the actual-innocence gateway.

The federal circuit courts of appeals remain unsettled on the question of whether a freestanding claim of actual innocence exists. John M. Leventhal, *A Survey of Federal and State Courts' Approaches to a Constitutional Right of Actual Innocence: Is There a Need for a State Constitutional Right in New York in the Aftermath of CPL § 440.10(1)(G-1)?*, 76 Alb. L. Rev. 1453, 1464–65 nn.83–95 (2013) (citing cases). If a freestanding claim of actual innocence exists, it would have to overcome an "extraordinarily high threshold." *Id.* at 1464 & n.85 (collecting cases); *see also Carriger v. Stewart,* 132 F.3d 463, 476 (9th Cir. 1997)

("Requiring affirmative proof of innocence is appropriate, because when a petitioner makes a freestanding claim of innocence, he is claiming that he is entitled to relief despite a constitutionally valid conviction.").

At the state level, a number of jurisdictions acknowledge freestanding claims of actual innocence. *Engesser*, 856 N.W.2d at 481 n.3 (collecting cases and statutes that allow freestanding claims of actual innocence). States that do recognize freestanding claims of actual innocence apply varying standards. *Compare People v. Washington*, 665 N.E.2d 1330, 1337 (Ill. 1996) (holding the defendant must present new evidence that is " 'of such conclusive character' as would 'probably change the result on retrial' " (quoting *People v. Silagy*, 507 N.E.2d 830, 834 (Ill. 1987))), *with State ex rel. Amrine v. Roper*, 102 S.W.3d 541, 548 (Mo. 2003) (en banc) (holding the petitioner must "make a clear and convincing showing of actual innocence that undermines confidence in the correctness of the judgment").

In *Washington*, the Illinois Supreme Court explicitly addressed whether a freestanding claim of actual innocence based on new evidence implicated the due process clause of the Illinois Constitution. 665 N.E.2d at 1335–37. In regards to procedural due process, the court reasoned "to ignore such a claim would be fundamentally unfair." *Id.* at 1336.

In terms of substantive due process, the court stated "[i]mprisonment of the innocent would also be so conscience shocking as to trigger operation of substantive due process." *Id.* It stated, "The [United States] Supreme Court rejected substantive due process as means to recognize freestanding innocence claims because of the idea that a person convicted in a constitutionally fair trial must be viewed as guilty." *Id.* In declining to adopt the reasoning of the United States

Supreme Court, the court stated, "The stronger the claim—the more likely it is that a convicted person is actually innocent—the weaker is the legal construct dictating that the person be viewed as guilty." *Id.* Because "no person convicted of a crime should be deprived of life or liberty given compelling evidence of actual innocence[,]" the court held the due process clause of the Illinois Constitution gives credence to freestanding claims of actual innocence and affords convicted defendants additional process. *Id.* at 1336–37.

In *Montoya*, the New Mexico Supreme Court held the New Mexico Constitution, specifically the due process clause and the prohibition against infliction of cruel and unusual punishment, provides protection to actually innocent people. 163 P.3d at 484. The court reasoned it would be "fundamentally unfair" to convict, incarcerate, or execute an innocent person. *Id.* The court further reasoned "the incarceration of an innocent person [fails to] advance[] any [acceptable] goal of punishment, and . . . the punishment is indeed grossly out of proportion to the severity of the crime." *Id.*

We now turn to the Iowa Constitution. First, we note the Iowa Constitution vests authority to grant pardons with the Governor. Iowa Const. art. IV, § 16; *State v. Ragland*, 836 N.W.2d 107, 118 (Iowa 2013). Thus, the incarceration of an actually innocent person in Iowa does not violate the Federal Constitution. *See Montoya*, 163 P.3d at 482; *Cole*, 765 N.Y.S.2d at 484. We therefore address the possibility of a freestanding claim of actual innocence pursuant to Iowa constitutional jurisprudence.

The Iowa Constitution affords individuals greater rights than does the United States Constitution. *See, e.g.*, *State v. Lyle*, 854 N.W.2d 378, 395 (Iowa 2014) (noting "we expanded the reach of the Supreme Court's

reasoning in a trilogy of juvenile justice cases decided under the Iowa Constitution"). Moreover, we have discretion to construe the Iowa Constitution in such a way as to "provid[e] greater protection for our citizens' constitutional rights." *Nguyen v. State,* 878 N.W.2d 744, 755 (Iowa 2016). Because we "jealously" safeguard our authority to interpret the Iowa Constitution on our own terms, we do not employ a lockstep approach in following federal precedent although United States Supreme Court cases are "persuasive." *See State v. Ochoa*, 792 N.W.2d 260, 267 (Iowa 2010).

Article I, section 9 of the Iowa Constitution prohibits the deprivation of liberty without due process of law. Iowa Const. art. I, § 9 (due process clause). We have enforced "the due process clause of article I, section 9 . . . in a wide variety of settings." *Godfrey v. State*, 898 N.W.2d 844, 871 (Iowa 2017). In fact, "[t]he Iowa constitutional provision regarding due process of law is . . . not a mere hortatory command, but it has been implemented, day in and day out, for many, many years." *Id.* We see no reason why article I, section 9 would not be enforceable for purposes of vindicating defendants who prove they are factually innocent and believe their incarceration triggers the due process clause.

An innocent person has a constitutional liberty interest in remaining free from undeserved punishment. Holding a person who has committed no crime in prison strikes the very essence of the constitutional guarantee of substantive due process. *See Cole*, 765 N.Y.S.2d at 485 (holding "the conviction or incarceration of a guiltless person violates elemental fairness, deprives that person of freedom of movement and freedom from punishment[,] and thus runs afoul of the due process clause of the [New York] State Constitution").

Even if defendants allege substantive due process violations, they must meet the demanding actual-innocence standard to prove the validity of their actual-innocence claims—a standard we articulate in the next section. Thus, there are limits on actual-innocence claims.

Moreover, actually innocent people should have an opportunity to prove their actual innocence. *Montoya*, 163 P.3d at 484 (holding "the conviction, incarceration, or execution of an innocent person violates all notions of fundamental fairness" and thus actually innocent people "must be permitted to assert a claim of actual innocence"). The incarceration of actually innocent people therefore implicates procedural due process.

Article I, section 17 of the Iowa Constitution prohibits cruel and unusual punishment. Iowa Const. art. I, § 17 (cruel and unusual punishment). This prohibition "embraces a bedrock rule of law that punishment should fit the crime." *Lyle*, 854 N.W.2d at 384 (quoting *State v. Bruegger*, 773 N.W.2d 862, 872 (Iowa 2009)); *accord Roper v. Simmons*, 543 U.S. 551, 560, 125 S. Ct. 1183, 1190 (2005) ("[T]he Eighth Amendment guarantees individuals the right not to be subjected to excessive sanctions."). Applying this bedrock principle, we believe "punishing an actually innocent person is disproportionate to the crime (or lack of crime) committed and violates the cruel and inhuman treatment clause." *Cole*, 765 N.Y.S.2d at 485; *accord Herrera*, 506 U.S. at 431, 113 S. Ct. at 876 (Blackmun, J., dissenting) (noting punishment "grossly out of proportion to the severity of the crime" is unconstitutional and excessive (quoting *Coker v. Georgia*, 433 U.S. 584, 592, 97 S. Ct. 2861, 2866 (1977) (plurality opinion))).

Furthermore, we agree with Justice Blackmun's dissent in *Herrera* that "it is crystal clear that the execution of an innocent person is 'at

odds with contemporary standards of fairness and decency.'" 506 U.S. at 431, 113 S. Ct. at 876 (quoting *Spaziano v. Florida*, 468 U.S. 447, 465, 104 S. Ct. 3154, 3165 (1984), *overruled on other grounds by Hurst v. Florida*, 577 U.S. ___, ___, 136 S. Ct. 616, 621 (2016)). We believe Justice Blackmun's reasoning also applies to the conviction and incarceration of an innocent person because "the basic concept underlying the prohibition against cruel and unusual punishment 'is nothing less than the dignity' of humankind." *Lyle*, 854 N.W.2d at 384 (quoting *Trop v. Dulles*, 356 U.S. 86, 100, 78 S. Ct. 590, 597 (1958)).

We reject the notion that the rationale used in cases involving trials cannot be applied to those involving pleas.[5] We find these cases informative because the same policy reason informs convictions based after trials as those based on pleas. *See Ex parte Tuley*, 109 S.W.3d 388, 391–92 (Tex. Crim. App. 2002); *see also People v. Tiger*, 48 N.Y.S.3d 685, 700–01 (App. Div. 2017) (citing *Ex parte Tuley*, 109 S.W.3d at 393) (holding a defendant's plea does not bar the defendant from bringing a freestanding claim of actual innocence). This policy reason is protecting against violations of constitutional principles.

The Texas Court of Criminal Appeals permits freestanding claims of actual innocence even if the applicant pled guilty. *Ex parte Tuley*, 109 S.W.3d at 393. In *Tuley*, the applicant pled guilty to aggravated sexual assault. *Id.* at 390. Years later, the applicant pursued postconviction relief when the complainant recanted her allegation. *Id.* The court sought to answer the question of whether the applicant's plea precluded his freestanding actual-innocence claim. *Id.* It reasoned the

---

[5]For example, the following cases involved convictions after trials: *Washington*, 665 N.E.2d at 1331; *Montoya*, 163 P.3d at 478; *In re Kaufmann*, 157 N.E. at 731; *Engesser*, 856 N.W.2d at 473.

policy behind allowing freestanding actual-innocence claims was to protect innocent individuals from punishment. *Id.* at 390–91. Specifically, the court reasoned, this policy "is the same for an applicant regardless of whether his case was heard by a judge or jury or whether he [pled] guilty or not guilty." *Id.*

The court further reasoned that "[c]onvicting courts should . . . give great respect to knowing, voluntary, and intelligent pleas of guilty." *Id.* at 391. However, "we should not foreclose relief because a defendant [pled] guilty when the policy behind granting relief on a bare innocence claim is the same." *Id.* Moreover, "[t]here is nothing equitable about permitting an innocent person to remain in prison when he produces new evidence that unquestionably shows that he did not commit the offense for which he is incarcerated." *Id.* at 392. Thus, the court held an applicant must "show[] by clear and convincing evidence that, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence." *Id.* We agree with the Texas Court of Criminal Appeals that the same rudimentary policy reason—safeguarding against violations of due process—form a substratum for claims of actual innocence, regardless of whether defendants pled guilty or went to trial.

Therefore, we now find the Iowa Constitution permits freestanding claims of actual innocence. Furthermore, freestanding claims of actual innocence permitted by the Iowa Constitution are available to applicants even though they pled guilty.

3. *The standard to apply to freestanding actual-innocence claims.* States that have adopted freestanding actual-innocence claims require a higher burden than that of a gateway claim for an applicant to succeed. We again note the United States Supreme Court adopted a more-likely-

than-not standard in proving gateway claims of actual innocence. *Schlup*, 513 U.S at 327, 115 S. Ct. 851 at 867.

In *Jamison v. State*, a case involving newly discovered evidence that would allegedly support an applicant's self-defense theory, the South Carolina Supreme Court adopted a stringent standard.[6] 765 S.E.2d 123, 130 (S.C. 2014).

There the court held,

> [W]hen a [postconviction-relief] applicant seeks relief on the basis of newly discovered evidence following a guilty plea, relief is appropriate only where the applicant presents evidence showing that (1) the newly discovered evidence was discovered after the entry of the plea and, in the exercise of reasonable diligence, could not have been discovered prior to the entry of the plea; and (2) the newly discovered evidence is of such a weight and quality that, under the facts and circumstances of that particular case, *the "interest of justice" requires the applicant's guilty plea to be vacated.* In other words, *a [postconviction-relief] applicant may successfully disavow his or her guilty plea only where the interests of justice outweigh the waiver and solemn admission of guilt encompassed in a plea of guilty and the compelling interests in maintaining the finality of guilty-plea convictions.*

*Id.* (emphasis added).

We believe the standard the South Carolina Supreme Court has adopted is not only amorphous but also impractical. What does it mean for the "interests of justice" to outweigh the guilty plea waiver? The permutations are endless. The standard set by the South Carolina Supreme Court does not appear to be any different from altogether barring an applicant's postconviction-relief action.

Similarly, the California Supreme Court requires applicants to meet a high burden such that the evidence "undermine[s] the entire

---

[6]We realize this case did not involve an actual-innocence claim but rather a self-defense theory. We think it is nevertheless informative in constructing a standard for freestanding actual-innocence claims in Iowa.

prosecution case and point[s] unerringly to innocence or reduced culpability." *In re Clark*, 855 P.2d 729, 739 (Cal. 1993); *accord In re Bell*, 170 P.3d 153, 157 (Cal. 2007).

The Texas Court of Criminal Appeals originally adopted a very burdensome standard, requiring applicants claiming actual innocence to demonstrate "based on the newly discovered evidence and the entire record before the jury that convicted him, no rational trier of fact could find proof of guilt beyond a reasonable doubt." *State ex rel. Holmes v. Honorable Ct. of Appeals*, 885 S.W.2d 389, 399 (Tex. Crim. App. 1994) (en banc), *overruled by Ex parte Elizondo*, 947 S.W.2d 202, 206 (Tex. Crim. App. 1996) (en banc).

However, in lowering the burden of proof, the court in *Ex parte Elizondo* stated the *Holmes* standard was too high because it would be "theoretically impossible" to attain relief. *Ex parte Elizondo*, 947 S.W.2d at 205. The court reasoned "exculpatory evidence can never outweigh inculpatory evidence under [the] standard" set in *State ex rel. Holmes. Id.* Thus, the court adopted a clear and convincing standard requiring "the petitioner must show *by clear and convincing evidence* that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 209.

A number of states apply the *Elizondo* clear and convincing standard. *See, e.g., Roper*, 102 S.W.3d at 548; *Montoya*, 163 P.3d at 486; *Cole*, 765 N.Y.S.2d at 486; *Miller v. State*, 340 P.3d 795, 796 (Utah Ct. App. 2014) (per curiam); *see also Miller v. Comm'r of Corr.*, 700 A.2d 1108, 1130–31 (Conn. 1997) (adopting a clear and convincing standard and also requiring the petitioner to show that "no reasonable fact finder would find the petitioner guilty").

Other jurisdictions have codified freestanding claims of actual innocence. The Maryland statute uses a standard of "substantial or

significant possibility that the result may have been different." Md. Code. Ann., Crim. Proc. § 8-301(a)(1) (West, Westlaw through ch.1–4 2018 Reg. Sess.). The statute gives the court discretion to "set aside the verdict, resentence, grant a new trial, or correct the sentence." *Id.* § 8-301(f)(1). The Maryland Court of Special Appeals, however, held a defendant who has pled guilty could not petition for a writ of actual innocence. *Yonga v. State*, 108 A.3d 448, 460 (Md. Ct. Spec. App. 2015), *aff'd* 130 A.3d 486, 492 (Md. 2016).

In discussing freestanding claims of actual innocence, the District of Columbia statute explicitly assigns different remedies upon meeting the respective standards. D.C. Code Ann. § 22-4135 (West, Westlaw through Feb. 20, 2018). If the court determines "it is more likely than not that the movant is actually innocent of the crime," the remedy is to grant a new trial. *Id.* § 22-4135(g)(2). If the court determines "by clear and convincing evidence that the movant is actually innocent of the crime," the remedy is to vacate the conviction. *Id.* § 22-4135(g)(3). Thus, the District of Columbia statute requires a more stringent standard to vacate a conviction but fashions this stronger remedy upon the movant meeting his or her burden of proof. Moreover, "[i]f the conviction resulted from a plea of guilty, and other charges were dismissed as part of a plea agreement, the court shall reinstate any charges of which the defendant has not demonstrated that the defendant is actually innocent." *Id.* § 22-4135(g)(4). Thus, the District of Columbia statute minimizes unfairness to the government by counterbalancing the movant's interest—vacating a wrongful conviction and ensuring a factually innocent person is not incarcerated—and the government's interest—allowing reinstatement of charges the government otherwise would have pursued if the movant had not pled guilty.

After reviewing the differing standards our sister states have adopted, we find that after pleading guilty, applicants claiming actual innocence must meet the clear and convincing standard. We reach this conclusion for a number of reasons. In *House*, the United States Supreme Court mentioned the required proof to establish actual innocence as a freestanding claim is greater than that required to establish a gateway claim of actual innocence. 547 U.S. at 555, 126 S. Ct. at 2087; *accord In re Weber*, 284 P.3d at 741 ("[A]ny standard by which a free-standing actual innocence claim must be proved will be higher than that applied in the gateway context.").

In light of *House*, a clear and convincing standard is the appropriate burden of showing a freestanding claim of actual innocence. This standard is heavier than the more-likely-than-not standard governing gateway claims of actual innocence. It makes sense to have a lower standard for gateway claims because such claims have underlying claims that allege constitutional defects in the trial or plea colloquy. However, an applicant bringing a freestanding claim of actual innocence is claiming he or she is factually and actually innocent, despite a fair, constitutionally compliant trial or plea colloquy free of constitutional defects.

Additionally, a clear and convincing standard balances the interest of an innocent defendant and that of the state. Although the interests of both parties are important, we believe "it is far worse to convict an innocent person than to acquit a guilty one" such that "the scale tips in favor of the [defendant's] interest." *Miller*, 700 A.2d at 1133. Thus, we simultaneously vindicate this principle and recognize the interest of the state in finality of criminal litigation by adopting a clear and convincing standard.

Finally, the higher burden answers the problems posed by the Colorado Supreme Court regarding claims of newly discovered evidence after a defendant has pled guilty. In *People v. Schneider*, the court stated,

> In the circumstance in which there never was a trial on the charges, the trial court is hampered in that assessment. Furthermore, there must be some consequence attached to the decision to plead guilty. *A defendant who voluntarily and knowingly enters a plea accepting responsibility for the charges is properly held to a higher burden in demonstrating to the court that newly discovered evidence should allow him to withdraw that plea.*

25 P.3d 755, 761–62 (Colo. 2001) (en banc) (emphasis added). However, by adopting a higher burden of proof—a clear and convincing standard—we account for the differences.

We now adopt the clear and convincing standard to prove a freestanding actual-innocence claim. For an applicant to succeed on a freestanding actual-innocence claim, the applicant must show by clear and convincing evidence that, despite the evidence of guilt supporting the conviction, no reasonable fact finder could convict the applicant of the crimes for which the sentencing court found the applicant guilty in light of all the evidence, including the newly discovered evidence.

4. *Vehicle to bring freestanding actual-innocence claims.* We now address whether our postconviction-relief statute provides a means to raise a freestanding claim of actual innocence. Outside of our current statutory scheme in chapter 822, we need not decide or specify other vehicles applicants may use to bring their freestanding actual-innocence claims as independent actions. We emphasize sections 822(1)(*a*) and (*d*) are not the exclusive vehicles to bring freestanding actual-innocence claims because applicants may file such claims independently of chapter

822. However, at this point, the legislature has provided the present, appropriate vehicle in chapter 822. The Code provides,

> 1. Any person who has been convicted of, or sentenced for, a public offense and who claims any of the following may institute, without paying a filing fee, a proceeding under this chapter to secure relief:
>
> *a.* The conviction or sentence was in violation of the Constitution of the United States or the Constitution or laws of this state.
>
> . . . .
>
> *d.* There exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice.

Iowa Code § 822.2(1)(*a*), (*d*).

The Iowa Constitution gives a floor to bring freestanding claims of actual innocence under our postconviction-relief statute, specifically sections 822.2(1)(*a*) and (*d*). *Cf. Washington,* 665 N.E.2d at 1337 (holding the due process clause of the Illinois Constitution provides a footing to assert freestanding actual-innocence claims based on newly discovered evidence under the Post-Conviction Hearing Act). A conviction of an innocent person violates the Iowa Constitution, specifically the due process clause and the prohibition against infliction of cruel and unusual punishment. Thus, section 822.2(1)(*a*) is one vehicle to bring an actual-innocence claim. Additionally, conviction of an innocent person infringes upon the "interest of justice" precisely because it violates the Iowa Constitution. Therefore, section 822.2(1)(*d*) is another vehicle to assert an actual-innocence claim.

In sum, we hold subsections 822.2(1)(*a*) and (*d*) provide avenues for freestanding actual-innocence claims.

**IV. Application of Legal Principles.**

We first address the statute of limitations issue and then the question of how to proceed under our new standard.

**A. Statute of Limitations.** Our postconviction-relief statute specifies its own limitations of action. The Iowa Code provides in relevant part,

> All . . . applications must be filed within three years from the date the conviction or decision is final or, in the event of an appeal, from the date the writ of procedendo is issued. However, this limitation does not apply to a ground of fact or law that could not have been raised within the applicable time period.

Iowa Code § 822.3.

Thus, to avoid the three-year statute of limitations contained in section 822.3, an applicant must show he or she could not have raised the ground of fact within the applicable time period. Additionally, "a postconviction-relief applicant relying on the ground-of-fact exception must show the ground of fact is relevant to the challenged conviction." *Harrington v. State*, 659 N.W.2d 509, 521 (Iowa 2003). This is the nexus requirement. *Id.* at 520. We made it clear a ground of fact is "relevant" if it is the type of fact "that has the potential to qualify as material evidence for purposes of a substantive claim under section 822.2." *Id.* at 521.

We explicitly and "specifically reject[ed] any requirement that an applicant must show the ground of fact would likely or probably have changed the outcome of the underlying criminal case in order to avoid a limitations defense." *Id.* The ultimate determination as to whether the applicant is entitled to relief "must await an adjudication, whether in a summary proceeding or after trial, on the applicant's substantive claim for relief." *Id.* In other words, we do not reach the merits of a claim

based on a new ground of fact in deciding whether the exception to the three-year statute of limitations applies.

Here, B.C.'s recantation was not available to Schmidt within the three-year period following the date of his conviction and Schmidt could not have discovered the recantation earlier than he did in the exercise of due diligence. Additionally, the recantation has the *potential* to qualify as material evidence that probably would have changed the outcome of Schmidt's case. *See id.* at 521 (holding the undisclosed police reports and the recantations "are the type of facts having the *potential* to qualify as material evidence that probably would have changed the outcome of [the defendant's] trial").

We ultimately decided *Harrington* based on the withheld police reports in order to resolve the due process issue of whether the prosecution suppressed material evidence that was favorable to the defendant. *Id.* at 521–25. As for the statute-of-limitations analysis, we held both the recantation evidence and the police reports were sufficient; and thus, the defendant was not time barred from bringing his action. *Id.* at 521.

Based on the foregoing, section 822.3 does not time bar Schmidt's freestanding claim of actual innocence.

**B. Application of Standard Regarding Schmidt's Freestanding Actual-Innocence Claim.** The district court ruled on Schmidt's case after the State filed a motion for summary dismissal/summary judgment. Section 822.6 allows for a summary disposition. The statute states in relevant part,

> The court may grant a motion by either party for summary disposition of the application, when it appears from the pleadings, depositions, answers to interrogatories, and admissions and agreements of fact, together with any

affidavits submitted, that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

Iowa Code § 822.6.

At the time the court ruled on the State's motion, it decided the case as a matter of law relying on our jurisprudence that defendants who knowingly and voluntarily plead guilty cannot attack their pleas with challenges extrinsic to the pleas. Today, we have reversed this line of cases and created a new standard for freestanding actual-innocence claims.

Generally, when we create a new standard, we remand the case to the district court to apply the standard. *See McQuistion v. City of Clinton*, 872 N.W.2d 817, 819–20 (Iowa 2015) (adopting a new standard for the evaluation of a pregnancy claim and remanding the case to the district court to apply that standard); *cf. State v. Ary*, 877 N.W.2d 686, 707 (Iowa 2016) (remanding the case to the district court to apply the appropriate standard when it initially applied the wrong standard).

Here, we have created a new standard. Thus, the proper result is to remand the case to the district court to apply the standard to the State's motion for summary dismissal/summary judgment. The court should allow the parties to supplement the record, if a party so desires, to provide other evidence or affidavits to support their respective positions. *See* Iowa R. Civ. P. 1.981(5) (setting forth the methods to present evidence in a summary judgment proceeding).

We are not commenting on the merits of Schmidt's claim. Contrary to the other opinions filed in this case, both parties are entitled to their day in court to litigate their positions under the new standard we have adopted today. We will address any unanswered questions when a party presents the court with actual cases raising those issues. That is

how the law progresses in this state. We do not issue advisory opinions. *See Linn v. Montgomery*, 903 N.W.2d 337, 344 (Iowa 2017).

It is for the district court to determine whether the recantation, in light of any other evidence that meets the requirements of rule 1.981, creates a genuine issue of material fact. We are not in a position to decide the merits of this case by assuming that certain evidence, which may or may not comply with the requirements of rule 1.981, shows there is no genuine issue as to any material fact in order to affirm the summary disposition in favor of the State. Prohibiting the parties here from the benefit of the procedural processes provided to litigants is no better than incarcerating an innocent person.

Only after the parties develop a record in a summary proceeding can the court decide if a genuine issue of material fact exists. If it does, then a trial may be necessary to resolve Schmidt's claim.

**V. Disposition.**

We vacate the decision of the court of appeals and reverse the judgment of the district court granting the State's motion for summary dismissal/summary judgment. We remand the case to the district court for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Cady, C.J., Hecht and Appel, JJ., join this opinion. Cady, C.J., files a special concurrence. Waterman, J., files a dissenting opinion in which Mansfield and Zager, JJ., join. Mansfield, J., files a separate dissenting opinion in which Waterman and Zager, JJ., join.

**CADY**, **Chief Justice (concurring specially).**

The process of justice must always be fair. This case stands tall as the embodiment of this fundamental principle of law. It is a substantial step forward in our constitutional march to become better. Innocent people should always have a forum to prove their innocence. I fully concur in the opinion of the court.

Yet, the actual process of justice available to Schmidt to now pursue the new claim given to him must also be fair. This fairness is the reason the case must be remanded to the district court for it to decide if summary adjudication should be granted. I write separately only to explain this important part of the case more fully and why the actual-innocence claim cannot now be decided on appeal.

Going forward, when an actual-innocence claim based on the recantation of a witness is brought in our courts, summary judgment will remain a viable procedural vehicle for the state to ask the court to resolve the claim. Consistent with all summary judgment proceedings, the legal issue will be whether the moving party is entitled to summary judgment, under a set of facts assumed to be undisputed for the purposes of the motion, because a reasonable juror could still conclude the defendant is guilty of the crime. For purposes of summary adjudication of witness recantation claims, the undisputed facts needed to support the motion will normally center on the remaining evidence of guilt from other witnesses found in the minutes of testimony. In many cases, the remaining evidence may support summary judgment, as a reasonable juror could still convict the defendant based on the surviving evidence.

In this case, the assumed undisputed facts, at this time, may support summary judgment. In his plea colloquy, Schmidt acknowledged the minutes of testimony were true and accurate. Significantly, the minutes included a witness who was an eyewitness to the assault. With only the recantation evidence offered by Schmidt at this point to prove his innocence, a reasonable fact finder could still conclude Schmidt committed the crime.

Nevertheless, it would be unfair to Schmidt for us to apply the new standard to the existing record to decide the actual-innocence claim now on appeal. At the time the State brought its motion for summary judgment in this case, it argued Schmidt's claim was barred by the three-year statute of limitations under Iowa Code section 822.3 (2014) and the recantation evidence identified in his petition for postconviction relief was discoverable within the limitation period. Thus, at the time Schmidt resisted the summary judgment motion, the legal issue before the court was whether the recantation was discoverable within the three-year period. The district court granted the summary judgment after concluding the exculpatory evidence was extrinsic to the plea and could not be grounds for relief.

Although Schmidt claimed his actual innocence in the summary judgment proceedings, the legal issue he was responding to was whether the recantation evidence was discoverable within the three-year statute of limitations. He was not responding to a substantive claim by the State that his recantation evidence would still be insufficient as a matter to law to support a claim of actual innocence. In fact, recantation as a claim of innocence has still not been teed up by the State, and Schmidt has not been alerted to the requirement to submit all evidence of innocence in direct response to such claim. Thus, the record does not show Schmidt

has had a full and fair opportunity to present all new evidence to resist summary judgment.

Likewise, the State has not had a full and fair opportunity to specifically identify its evidence to support summary adjudication under the actual-innocence standard. *See* Iowa Code § 822.6. Even though the state asked the district court in the summary judgment proceedings to take judicial notice of the complete record in the case, the state must still identify those portions of the record it relies on to support summary judgment. *See id.*

The case needs to be remanded to the district court so the State can amend its motion for summary judgment to claim Schmidt has failed to bring a claim of actual innocence that survives summary adjudication. The district court needs to consider the motion after Schmidt has filed an amended response. This procedure is required to ensure the process of justice is fair.

**WATERMAN**, **Justice (dissenting).**

I respectfully dissent and would affirm the district court's summary judgment and the court of appeals decision affirming it under our long-standing precedent enforcing the legal effect of guilty pleas. I join Justice Mansfield's separate dissent. This year, the United States Supreme Court resoundingly reiterated a fundamental legal tenet: a valid guilty plea waives the defendant's constitutional right to trial and right to confront witnesses and "relinquishes any claim that would contradict the 'admissions necessarily made upon entry of a voluntary plea of guilty.' " *Class v. United States*, 583 U.S. ___, ___, 138 S. Ct. 798, 805 (2018) (quoting *United States v. Broce*, 488 U.S. 563, 573–74, 109 S. Ct. 757, 764 (1989)). A guilty plea precludes a defendant from a later challenge in which he would "deny that he engaged in the conduct to which he admitted." *Id.* All nine justices agreed with that proposition. *See id.* at ___, 138 S. Ct. at 815 (Alito, J., dissenting).[7] When Schmidt confessed in open court and pled guilty, he closed the door to his subsequent claim that he is factually innocent, that is, that he really did not do what he admitted doing. The majority today errs by relying on cases in which the defendant steadfastly maintained his or her innocence through trial and all subsequent appeals.

---

[7]The *Class* Court held the defendant's guilty plea alone did not bar his challenge to his conviction on grounds the statute of conviction was unconstitutional. ___ U.S. at ___, 138 S. Ct. at 803 (majority opinion). Iowa appears to recognize the same exception because we allow the defendant who pled guilty to later assert that the indictment or information charges no offense. *See, e.g.*, *State v. Burgess*, 639 N.W.2d 564, 567 (Iowa 2001). This is a matter intrinsic to the plea because it does not require resort to anything other than the trial information and the plea of guilty.

Schmidt makes no such constitutional challenge to the statutes he pled guilty to violating. The *Class* Court made clear that a defendant who pleads guilty waives any right to later contest his factual guilt, challenge the evidence against him, or retreat from factual admissions in the guilty plea. 583 U.S. at___, 138 S. Ct. at 804, 805–06; *id.* at ___, 138 S. Ct. at 812–13 (Alito, J., dissenting.

I would also affirm summary judgment based on the statute of limitations because Schmidt knew what really happened in the bedroom and knew when he pled guilty whether his victim, B.C., and the eyewitness, Peter, were lying. Schmidt knowingly and voluntarily waived his right to challenge their allegations when he pled guilty in a detailed colloquy with the court while represented by effective defense counsel. Iowa law has always provided innocent people a forum to prove their innocence—through a trial. Schmidt is an admittedly guilty man who chose to give up his right to trial.

The majority undermines the finality of guilty pleas and eviscerates the three-year statute of limitations for postconviction-relief (PCR) actions. Today's decision will have bad consequences, as counsel for the State warned, including fewer plea bargains, renewed turmoil for victims and their families years after the crime, and a flood of PCR applications. The majority, by remanding this case instead of itself applying its new standard on the existing record, needlessly leaves district courts in the dark on whether evidentiary hearings or new trials will be required *whenever* a victim or other witness recants years after a defendant, ably represented by competent counsel, formally confessed to the crime in open court through a guilty plea devoid of legal error. Soon, we will see PCR applications by defendants who pled guilty to domestic assault and now bully the survivors into recanting.

Courts appropriately regard recantations with the utmost suspicion—especially those involving intrafamily sexual abuse. In my view, summary judgment can and should be affirmed on the existing record after remand under the majority's newly adopted test for actual innocence. This is because Schmidt cannot show, despite B.C.'s "recantation," that no reasonable juror could convict him based on

Peter's unrecanted eyewitness account of catching Schmidt in the act and B.C.'s contemporaneous statements and forensic interview describing the sexual assault. Indeed, Iowa juries, even without eyewitness testimony, have convicted defendants charged with domestic abuse based solely on what the victim said happened right after the abuse, disbelieving the victim's subsequent recantation at trial.[8] B.C.'s *quasi*-recantation essentially can be paraphrased as, "I said it happened back then, but now that my much bigger brother is getting out of prison I'm telling people it didn't happen—you guess which story is true." This equivocal recantation should be insufficient to vacate Schmidt's guilty plea. I would wait for a better test case to adopt a standard for relief under an actual-innocence theory.

## I. The District Court Properly Granted Summary Judgment Based on Schmidt's Guilty Plea.

The majority is unable to find fault with the manner in which Schmidt pled guilty. Schmidt raises no claim that his counsel was ineffective and alleges no defect or constitutional infirmity in connection with his guilty plea. The majority, nevertheless, allows Schmidt, and presumably any other convicted offender, to belatedly challenge a guilty plea based solely on someone's subsequent recantation. The majority thereby upends Iowa law on the finality of guilty pleas and does so without acknowledging the many built-in protections our legal system employs to ensure the validity of plea-based convictions and without quoting Schmidt's in-court colloquy showing those safeguards were followed to the letter in his case.

---

[8] *See, e.g., State v. Smith*, 876 N.W.2d 180, 183–84, 190 & n.4 (Iowa 2016).

Until today, it had been "well settled that a plea of guilty 'waives all defenses or objections which are not intrinsic to the plea itself.' " *State v. Alexander*, 463 N.W.2d 421, 422 (Iowa 1990) (quoting *State v. Morehouse*, 316 N.W.2d 884, 885 (Iowa 1982), *overruled on other grounds by State v. Kress*, 636 N.W.2d 12, 20 (Iowa 2001)). I would honor stare decisis and affirm Schmidt's conviction under the foregoing precedent.

> Generally, a criminal defendant waives all defenses and objections to the criminal proceedings by pleading guilty . . . . One exception to this rule involves irregularities intrinsic to the plea—irregularities that bear on the knowing and voluntary nature of the plea.

*Castro v. State*, 795 N.W.2d 789, 792 (Iowa 2011) (citation omitted) (addressing when ineffective assistance of counsel constitutes an irregularity intrinsic to the plea by rendering it involuntary or unknowing). Schmidt does not dispute the district court's finding that his guilty plea was knowing and voluntary, and he has never alleged ineffective assistance of counsel.

"A plea colloquy that covers the specific ground subsequently raised in a postconviction relief application would normally support summary judgment on those grounds." *Id.* at 795. The district court properly considered Schmidt's admissions in his plea colloquy and the legal effect of his guilty plea in granting the State's motion for summary disposition of the PCR action. *See id.* Schmidt was not entitled to an evidentiary hearing on the veracity of B.C.'s recantation without first establishing that his guilty plea was unknowing or involuntary. It is undisputed that Schmidt pled guilty and admitted to the crimes in the plea colloquy. The legal effect of his guilty plea is a question of law the district court correctly decided by summary judgment on the existing PCR record. *See id.* at 793, 795–96.

Nothing B.C. says now or said in 2006 may be regarded as an irregularity intrinsic to Schmidt's guilty plea. "Any subsequently-discovered deficiency in the State's case that affects a defendant's assessment of the evidence against him, but not the knowing and voluntary nature of the plea, is not intrinsic to the plea itself." *State v. Speed*, 573 N.W.2d 594, 596 (Iowa 1998). "Notions of newly discovered evidence simply have no bearing on a knowing and voluntary admission of guilt." *Alexander*, 463 N.W.2d at 423. New exculpatory evidence does not alter "a defendant's understanding of what a plea means." *Speed*, 573 N.W.2d at 596 (distinguishing the "defendant's tactical rationale for pleading guilty"). Thus, "[a] guilty plea is normally understood as a lid on the box, whatever is in it, not a platform from which to explore further possibilities." *Kyle v. State*, 322 N.W.2d 299, 304 (Iowa 1982) (quoting *United States v. Bluso*, 519 F.2d 473, 474 (4th Cir. 1975)). I would keep the proverbial lid on the box. When a tenable claim of actual innocence comes along, we will know it. This is not such a case.

The majority upends our long-standing precedent on guilty pleas. I find it astounding that neither the majority nor the special concurrence ever mentions stare decisis, the doctrine that provides stability, predictability, and legitimacy to our law. Just months ago, our court unanimously reiterated, "From the very beginnings of this court, we have guarded the venerable doctrine of stare decisis and required the highest possible showing that a precedent should be overruled before taking such a step." *State v. Iowa Dist. Ct.*, 902 N.W.2d 811, 817 (Iowa 2017) (quoting *McElroy v. State*, 703 N.W.2d 385, 394 (Iowa 2005)); *see also Bd. of Water Works Trs. v. Sac Cty. Bd. of Supervisors*, 890 N.W.2d 50, 61 (Iowa 2017) ("Legal authority must be respected . . . because it is important that courts, and lawyers and their clients, may know what the

law is and order their affairs accordingly." (quoting *State v. Liddell*, 672 N.W.2d 805, 813 (Iowa 2003))). We may overrule a decision found to be "clearly erroneous" when "compelling reasons exist" to do so. *State v. Williams*, 895 N.W.2d 856, 859–60 (Iowa 2017) (overruling *State v. Wing*, 791 N.W.2d 243 (Iowa 2010)). In *Wing*, a divided court had overturned long-standing Iowa precedent and adopted a new interpretation of the speedy indictment rule that proved unworkable in practice; by overruling *Wing*, our court restored the prior long-standing Iowa rule that worked well. *See id.* at 867–68 (Mansfield, J., specially concurring). The *Williams* majority devoted a section of the opinion to stare decisis. *See id.* at 859–60 (majority opinion). The dissent lectured about the importance of the doctrine and pointedly "call[ed] for the restoration of the principle of stare decisis in Iowa jurisprudence." *Id.* at 870 (Wiggins, J., dissenting). Yet today the same members of this court say nothing about stare decisis and overrule countless decisions without showing that our guilty plea precedent was clearly erroneous or unworkable.

Iowa law requires a detailed guilty plea colloquy to satisfy the court that the defendant's plea is knowing and voluntary and that there is a factual basis for the crime. *See* Iowa R. Crim. P. 2.8(2)(*b*); *see also Diaz v. State*, 896 N.W.2d 723, 732–34 (Iowa 2017) (vacating guilty plea based on ineffective assistance of counsel because plea colloquy failed to address the postdeportation immigration consequences of the conviction). Iowa Rule of Criminal Procedure 2.8 requires the court to determine "the plea is made voluntarily and intelligently and has a factual basis." Iowa R. Crim. P. 2.8(2)(*b*). Before accepting a plea, the court must address the defendant in open court and determine if he or she understands

(1) The nature of the charge to which the plea is offered.

(2) The mandatory minimum punishment, if any, and the maximum possible punishment provided by the statute defining the offense to which the plea is offered.

(3) That a criminal conviction, deferred judgment, or deferred sentence may affect a defendant's status under federal immigration laws.

(4) That the defendant has the right to be tried by a jury, and at trial has the right to assistance of counsel, the right to confront and cross-examine witnesses against the defendant, the right not to be compelled to incriminate oneself, and the right to present witnesses in the defendant's own behalf and to have compulsory process in securing their attendance.

(5) That if the defendant pleads guilty there will not be a further trial of any kind, so that by pleading guilty the defendant waives the right to a trial.

*Id.* The court also must inquire "whether the defendant's willingness to plead guilty results from prior discussions between the attorney for the state and the defendant or the defendant's attorney" and disclose the plea agreement on the record. *Id.* r. 2.8(2)(*c*). Schmidt alleges no violation of rule 2.8 in this PCR action.

Here, the district court fully complied with rule 2.8 in accepting Schmidt's guilty plea. The district court described the legal rights Schmidt would have if he withdrew the plea and went to trial, and Schmidt informed the court he understood his rights and wished to plead guilty to the charges. The court reviewed the factual basis for each count. The prosecutor recited the elements of assault with intent to commit sexual abuse and the maximum and minimum penalties for that offense. After confirming Schmidt understood, the court inquired whether the minutes of testimony were accurate concerning this offense:

THE COURT: . . . What I am trying to find out is with regard to the elements of this crime, I'm talking about assault with intent to commit sexual abuse, and we have described those elements to you, in connection with those

elements, do the Minutes of Testimony, that is what the witnesses would say at trial, do they accurately and truthfully tell us what you did?

THE DEFENDANT: Yes, sir.

. . . .

THE COURT: Just tell me what you did that makes you think you are guilty.

THE DEFENDANT: I grabbed a child and tried to perform a sex act against his will.

. . . .

THE COURT: Is [B.C.] the person you tried to commit a sex act with?

THE DEFENDANT: Yes, sir.

THE COURT: Did this occur on or about February 25th, 2006, in Woodbury County, Iowa?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that by grabbing him, the state alleges you assaulted him by that grabbing? Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: The state claims that by grabbing him and making this attempt, that this was offensive to [B.C.]. Do you agree that [B.C.] could have found this grabbing offensive?

THE DEFENDANT: Probably, sir.

THE COURT: The state claims that when you grabbed him, you did so with the specific intent to commit a sex act, and you said that you did grab him in an attempt to commit a sex act; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: So was that your specific intent? That was your intention at the time?

THE DEFENDANT: Yes, sir.

THE COURT: Now, a sex act in this case, the state alleges that you were attempting to make contact between your penis and anus of [B.C.]. That's what they are claiming. Is that what happened?

THE DEFENDANT: Yes, sir.

. . . .

THE COURT: Mr. Schmidt, are you telling me you are, in fact, guilty to this crime of assault with intent to commit sexual abuse?

THE DEFENDANT: Yes, sir.

Next, the prosecutor recited the elements of incest and the maximum and minimum penalties. After confirming Schmidt understood, the court engaged in another colloquy:

> THE COURT: . . . With regard to the elements of this crime of incest, do these summaries of what the witnesses would say with regard to the elements of that crime, truthfully and accurately describe what you did?

> THE DEFENDANT: Okay. I performed the sex act—Yes, sir. Those are accurate.

> . . . .

> THE COURT: Now I need to have you tell me in your own words what you did that makes you think that you are guilty of this charge.

> THE DEFENDANT: I performed a sex act on a minor child.

> . . . .

> THE COURT: The state claims that the sex act that you performed was contact between your penis and [B.C.'s] anus. Do you agree that that was the contact that was performed?

> THE DEFENDANT: Yes, sir.

> . . . .

> THE COURT: Do you agree that at the time that you performed the sex act upon [B.C.] that he was your brother?

> THE DEFENDANT: Yes, sir.

Schmidt told the court he was satisfied with the services of his counsel. The court accepted Schmidt's guilty plea, finding the plea was "made voluntarily and intelligently" and Schmidt "underst[ood] the legal rights that he [was] giving up by pleading guilty to each of these two charges." Schmidt does not challenge those findings, which the district court and court of appeals correctly determined required the summary dismissal of his PCR action.

A plea must "be a genuine one, by a defendant who is guilty; one who understands his situation, his rights, and the consequences of the

plea, and is neither deceived nor coerced." *State v. Hinners,* 471 N.W.2d 841, 843 (Iowa 1991) (quoting *State v. Whitehead,* 163 N.W.2d 899, 902 (Iowa 1969)). A guilty plea is effectively a confession of committing the crime made under judicial oversight with representation by defense counsel. *See Woods v. State,* 379 P.3d 1134, 1141 (Kan. Ct. App. 2016). That is what we have here. As the United States Supreme Court has held, "A plea of guilty is more than a voluntary confession made in open court. It also serves as a stipulation that no proof by the prosecution need b[e] advanced . . . . It supplies both evidence and verdict, ending controversy." *Boykin v. Alabama,* 395 U.S. 238, 242 n.4, 89 S. Ct. 1709, 1712 n.4 (1969) (alteration in original) (quoting *Woodard v. State,* 171 So. 2d 462, 469 (Ala. Ct. App. 1965)); *see also Class,* 583 U.S. at ___, 138 S. Ct. at 804 (majority opinion) ("The plea of guilty is, of course, a confession of all the facts charged in the indictment, and also of the evil intent imputed to the defendant." (quoting *Commonwealth v. Hinds*, 101 Mass. 209, 210 (1869))). For this reason, the United States Supreme Court and, until today, our court has upheld knowing and voluntary guilty pleas. *See Brady v. United States*, 397 U.S. 742, 757, 90 S. Ct. 1463, 1473 (1970) ("A defendant is not entitled to withdraw his plea merely because he discover[ed] long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action."); *Speed*, 573 N.W.2d at 597 ("The fact that an accused may elect to plead guilty to a lesser offense when he is also charged with a more serious offense does not make his plea coerced." (quoting *State v. Lindsey,* 171 N.W.2d 859, 865 (Iowa 1969))).

Schmidt relies on *People v. Whirl*, which allowed postconviction claims to proceed to challenge a conviction resulting from a guilty plea

following a confession coerced by police torture. 39 N.E.3d 114, 117 (Ill. App. Ct. 2015). That case is inapposite because Schmidt claims no torture, coercion, or other constitutional violation in connection with his guilty plea.

> [W]hen a defendant pleads guilty, the case is effectively closed. The [prosecutor] believes that he or she will no longer need to develop the case for presentation to a jury, and investigation and witness identification ceases. Similarly, victims believe that the case is over. Unlike a conviction by trial, which the defendant can appeal and continue to contest vigorously, when a defendant enters a plea, he or she admits wrongdoing.

*People v. Schneider*, 25 P.3d 755, 760 (Colo. 2001) (en banc); *see also Commonwealth v. Martinez*, 539 A.2d 399, 401 (Pa. Super. Ct. 1988) ("After a defendant has entered a plea of guilty the only cognizable issues in a [postconviction] proceeding are the validity of the plea of guilty and the legality of the sentence."). The State should be able to rely on the finality of guilty pleas such as Schmidt's entered in compliance with Iowa law. As Justice Alito observed, "Roughly 95% of felony cases in the federal and state courts are resolved by guilty pleas. Therefore it is critically important that defendants, prosecutors, and judges understand the consequences of these pleas." *Class*, 583 U.S. at___, 138 S. Ct. at 807 (Alito, J., dissenting).

The majority's holding undermines the value of guilty pleas. "One of the benefits to the state from a plea bargain is finality." *Rhoades v. State*, 880 N.W.2d 431, 447–49 (Iowa 2016) (holding guilty plea barred recovery for wrongful imprisonment). Other "factors favoring pleas include risk avoidance, conservation of prosecution and court resources, efficiency, and timeliness of disposition." *Id.* at 449. The State (and victims) can no longer rely on the finality of guilty pleas. If Schmidt had gone to trial in 2007, the State presumably would have proven its case

then, and trial testimony would have been preserved for any retrial. Not so when trial preparation is short-circuited by a guilty plea and no trial takes place. *See id.* (noting the lack of a trial record when the defendant pleads guilty).

The majority fails to confront the proof problems that arise when a defendant is allowed to renege on a guilty plea years later and there is no prior trial record because of his guilty plea. Other courts avoid such problems by enforcing the guilty plea. *See Weeks v. Bowersox*, 119 F.3d 1342, 1355 (8th Cir. 1997) (Loken, J., concurring) (acknowledging the "inherent paradox in the notion that someone who has stood in open court and declared, 'I am guilty,' may turn around years later" and claim postconviction relief); *Norris v. State*, 896 N.E.2d 1149, 1153 (Ind. 2008) (noting the difficulty in "harmoniz[ing] th[e] new position taken by the defendant with the fact that he originally admitted to committing the crime by his guilty plea," given that "[b]oth his confession and his new claims cannot be true"); *Yonga v. State*, 108 A.3d 448, 461–63 (Md. Ct. Spec. App. 2015) (explaining that new evidence cannot be compared to a nonexistent trial record), *aff'd* 130 A.3d 486, 492 (Md. 2016) (concluding "that a person who has pled guilty may not later avail himself or herself of the relief afforded by the Petition for a Writ of Actual Innocence").

The district court correctly granted the State's motion for summary judgment. Relying on the court of appeals recent decision in *Walters v. State*, the district court found that "newly-discovered exculpatory evidence does not provide grounds to withdraw a guilty plea 'unless it is intrinsic to the plea itself.'" No. 12–2022, 2014 WL 69589, at *3 (Iowa Ct. App. Jan. 9, 2014) (quoting *Speed*, 573 N.W.2d at 596). The court of appeals correctly affirmed the district court's summary judgment dismissing Schmidt's PCR action. The court of appeals found "the

analysis and reasoning in *Walters* to be spot-on" and held that "because Schmidt's convictions were entered following his guilty pleas, he cannot challenge those convictions in a PCR action on the basis of newly discovered evidence in the form of his victim's alleged recantation." I agree.

Nothing in today's majority opinion should preclude the State from introducing Schmidt's guilty plea colloquy into evidence at the postremand hearing. In my view, Schmidt's admissions of guilt in 2007 entitle the State to summary dismissal of his PCR claims. *See Castro*, 795 N.W.2d at 795.

**II. B.C.'s "Recantation" Is Insufficient to Vacate Schmidt's Guilty Plea.**

We have never vacated a guilty plea based on the victim's recantation. The majority fails to mention that "[w]e have repeatedly held that a witness' recantation testimony . . . is looked upon with the utmost suspicion." *Jones v. State*, 479 N.W.2d 265, 275 (Iowa 1991). Our skepticism of recantations is widely shared. *Haouari v. United States*, 510 F.3d 350, 353 (2d Cir. 2007) ("It is axiomatic that witness recantations 'must be looked upon with the utmost suspicion.'" (quoting *Ortega v. Duncan*, 333 F.3d 102, 107 (2d Cir. 2003))); *see also Yonga*, 108 A.3d at 475 (noting "post-trial recantation[s] of witnesses are looked on with the utmost suspicion" (quoting *Carr v. State*, 387 A.2d 302, 305–06 (Md. Ct. Spec. App. 1978), *rev'd on other grounds*, 397 A.2d 606 (Md. 1979))); *Addai v. State*, 893 N.W.2d 480, 483 (N.D. 2017) ("This Court reviews recanting testimony with suspicion and disfavor.").

> This is because recantations "upset[] society's interest in the finality of convictions, [are] very often unreliable and given for suspect motives, and most often serve[] merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction."

*Haouari*, 510 F.3d at 535 (alterations in original) (quoting *Dobbert v. Wainwright*, 468 U.S. 1231, 1233–34, 105 S. Ct. 34, 36 (1984) (Brennan, J., dissenting from denial of certiorari)).

Our distrust is heightened when the recanting victim is a child sexually abused by a family member. *See, e.g., State v. Kostman*, 585 N.W.2d 209, 210 (Iowa 1998) (per curiam) ("The victim further admitted he once recanted the allegations because he and Kostman 'went camping together and always had fun and [he] didn't want to see nothing happen to him and it was just—[he] was just kind of scared.'" (Alteration in original.)). In *State v. Tharp*, the defendant's stepdaughter recanted her testimony that he had sexually abused her. 372 N.W.2d 280, 282 (Iowa Ct. App. 1985). The district court denied his motion for new trial. *Id.* The court of appeals affirmed, observing,

> A witness' recantation of her testimony is looked upon with the utmost suspicion, and does not necessarily entitle the defendant to a new trial. The trial court must make its decision based on the facts of the whole trial and those in conjunction with the motion. The victim was a 15 year old stepdaughter of defendant. In cases of this type, where families are torn apart, there is great pressure on the child to "make things right."

*Id.* (footnote omitted) (citations omitted).

This view too is widely shared. *See United States v. Provost*, 969 F.2d 617, 621 (8th Cir. 1992) ("Recantation is particularly common when family members are involved and the child has feelings of guilt or the family members seek to influence the child to change her story."); *Myatt v. Hannigan*, 910 F.2d 680, 685 n.2 (10th Cir. 1990) ("[T]he child's recanting of her statement to family members is not atypical in sex abuse cases."); *Schneider*, 25 P.3d at 763 ("Skepticism about recantations is especially applicable in cases of child sexual abuse where recantation is a recurring phenomenon."); *State v. Gallagher*, 554 A.2d 221, 225 (Vt.

1988) (allowing hearsay exception for child victims of sex crimes because of "the high probability of a child victim recanting a statement about being abused sexually"); *see also Norris*, 896 N.E.2d at 1155 (Boehm, J. concurring) (viewing recantation of victim's mother as "inherently somewhat suspect, coming as it does after the fact and from [a] relative[] of the defendant").[9]

Recantations are especially common with victims of domestic violence. *See State v. Smith*, 876 N.W.2d 180, 187–88 (Iowa 2016) (citing authorities concluding many victims of domestic violence recant); *id.* at 194 (Waterman, J., dissenting) ("The rate of recantation among domestic violence victims has been estimated between eighty and ninety percent."). After today, we can expect that offenders who already pled guilty will try to pressure their victims to recant.

Mindful of the law's appropriate distrust of recantations by victims of child sex abuse, I conclude B.C.'s fainthearted "recantation" is

---

[9]One study showed twenty-two percent of children recant allegations, but ninety-two percent of those who recanted eventually reaffirmed the abuse. Teena Sorensen & Barbara Snow, *How Children Tell: The Process of Disclosure in Child Sexual Abuse Cases*, 70 Child Welfare 3, 11 (1991). The influence of family pressure and familial relationships outweighs other factors in the victim's likelihood to recant. Margaret H. Shiu, *Unwarranted Skepticism: The Federal Courts' Treatment of Child Sexual Abuse Accommodation Syndrome*, 18 S. Cal. Interdisc. L.J. 651, 674 (2009); *cf.* Lindsay C. Malloy et al., *Filial Dependency and Recantation of Child Sexual Abuse Allegations*, 46 J. Am. Acad. Child & Adolescent Psychiatry 162, 167 (2007) ("Recantation appears to reflect susceptibility to pressures from influential adults, a pattern that complements and extends decades of research on children's suggestibility. However, whereas the latter research emphasizes the dangers of false allegations of abuse that can result from external pressures, our study suggests that pressures can lead truly abused children to recant."). A victim may also recant to avoid confronting his or her abuser in the legal system. *See* Anoosha Rouhanian, *A Call for Change: The Detrimental Impacts of* Crawford v. Washington *on Domestic Violence and Rape Prosecutions*, 37 B.C. J.L. & Soc. Just. 1, 37 (2017) ("[A] rape victim may recant for any number of reasons other than because they were lying about the rape itself. . . . [R]ape victims might recant . . . because they fear confronting their attackers, whether directly or indirectly, through legal proceedings.").

insufficient to vacate Schmidt's guilty plea. B.C.'s affidavit stated in its entirety:

> I, [B.C.], being first duly sworn hereby depose and state as follows:
>
> I was the victim in Woodbury County Criminal Case FECR054257, State of Iowa vs. Jacob Schmidt. Jacob Schmidt is my brother. I am currently 23 years of age, but was a child at the time of the criminal case. At the time of the original criminal case, I had told various people that Jacob had sexually abused me. When I was 21 years old, I told other people that Jacob had never touched me in a sexual way or sexually abused me. I didn't tell anyone before that date that nothing had really happened, and so Jacob couldn't have known before then. I decided to tell people when I turned 21 since I was a full adult at that time. I want to see my brother and tell him I am sorry that I couldn't tell anyone before then.

Notably, B.C. never stated under oath which story he told is true. Nor did B.C. claim that police or his family induced him to lie in 2007. The timing of B.C.'s new story seven years later coincides with Schmidt's expected release from prison. On February 25, 2006, the night Peter caught Schmidt in the act of attempting to rape B.C., Schmidt stood six foot, three inches tall and weighed between 350 and 400 pounds. B.C., who had just celebrated his fourteenth birthday, was four feet, six inches tall and weighed between seventy-five and ninety pounds. While B.C. may have added some pounds and inches since then, I can understand his motivation to make peace with his much larger half-brother before Schmidt's release from prison.

Perhaps an evidentiary hearing on remand will bring this matter to a swift conclusion. "The trial court is not required to believe the recantation . . . ." *State v. Compiano*, 261 Iowa 509, 517, 154 N.W.2d 845, 849 (1967). To the contrary, if the court believes the recantation is false,

and is not reasonably well satisfied that the testimony given by the witness [at] trial was false, . . . it is not at liberty to shift upon the shoulders of another jury the responsibility to seek out the truth of that matter.

*Id.*

We have repeatedly affirmed denials of applications for postconviction relief based on witness recantations. *See Jones*, 479 N.W.2d at 275 (affirming district court's denial of application for PCR because "Jones' entire claim is based upon an assumption that Coleman's trial testimony was in fact false," but "[t]he postconviction court is certainly not required to believe the recantation"); *State v. Folck*, 325 N.W.2d 368, 377 (Iowa 1982) ("Recantation of trial testimony is viewed with suspicion, and the trial court has broad discretion in looking to the whole record to determine if defendant had a fair trial."); *see also State v. Frank*, 298 N.W.2d 324, 329 (Iowa 1980) (noting testimony later recanted still had probative value); *State v. Taylor*, 287 N.W.2d 576, 578 (Iowa 1980) (affirming denial of motion for new trial because a recantation is "not really based on newly discovered evidence"); *State v. Jackson*, 223 N.W.2d 229, 234 (Iowa 1974) ("The general rule is a witness' recantation should be looked upon with utmost suspicion.").

When the witness's original testimony is corroborated by other evidence supporting the conviction following a jury trial, a subsequent recantation seldom warrants relief. *See Adcock v. State*, 528 N.W.2d 645, 648 (Iowa Ct. App. 1994) (affirming district court's denial of postconviction relief when witness recanted because "there was other evidence connecting Adcock to the crime"); *see also Frank*, 298 N.W.2d at 329–30 (affirming conviction when independent evidence corroborated witness's original testimony that she later recanted). Peter's unrecanted eyewitness account corroborates B.C.'s original contemporaneous report

to the police and forensic interviewer. Schmidt therefore is not entitled to relief from his conviction.

### III. Schmidt's PCR Action Is Untimely.

I would also affirm the summary judgment because Schmidt's PCR—filed seven years after his conviction—is time-barred under Iowa Code section 822.3's three-year statute of limitations. The majority holds it is not time-barred because Schmidt could not know within the limitations period that B.C. would later recant. But Schmidt did know what happened in the bedroom in 2006 and knew then whether the allegations made by Peter and B.C. were false.

PCR actions "must be filed within three years from the date the conviction or decision is final or, in the event of an appeal, from the date the writ of procedendo is issued." Iowa Code § 822.3 (2014). An exception is made for applications claiming "a ground of fact or law that could not have been raised within the applicable time period." *Id.* The three-year time-bar "limit[s] postconviction litigation in order to conserve judicial resources, promote substantive goals of the criminal law, foster rehabilitation, and restore a sense of repose in our system of justice." *Wilkins v. State*, 522 N.W.2d 822, 824 (Iowa 1994) (quoting *State v. Edman*, 444 N.W.2d 103, 106 (Iowa Ct. App. 1989)). A corollary purpose is " 'to reduce injustices occurring as a result of lost witnesses' necessary to resolve factual issues arising in postconviction proceedings and upon retrial of cases where convictions have been overturned." *Dible v. State*, 557 N.W.2d 881, 885 (Iowa 1996) (quoting *Brewer v. Iowa Dist. Ct.*, 395 N.W.2d 841, 843 (Iowa 1986)), *abrogated on other grounds by Harrington v. State*, 659 N.W.2d 509, 521 (Iowa 2003).

To further those goals, the exception to the three-year time-bar in section 822.3 is limited to claims in which the applicant had "no

opportunity to test the validity of the conviction in relation to [the ground of fact or law that allegedly could not have been raised within the time period]." *Wilkins*, 522 N.W.2d at 824 (alteration in original) (quoting *Edman*, 444 N.W.2d at 106). An applicant may not assert a claim he or she has "at least been alerted to" in the prior action. *Id.* This promotes repose and conserves judicial resources. *See id.* (holding second application for relief was time-barred when applicant should have been alerted to "ground of fact" in prior postconviction application); *see also Dible*, 557 N.W.2d at 886 (barring action when applicant was aware of ground of fact because "[a]ny other decision would result in an endless procession of postconviction actions, and the legislature's hope to avoid stale claims and to achieve a sense of repose in the criminal justice system would not be realized").

The State filed a two-pronged motion for summary judgment to dismiss Schmidt's PCR action, arguing that his (1) guilty plea barred relief and (2) PCR application was barred by the three-year statute of limitations. The State correctly argued B.C.'s statements were not "new evidence" that could not have been discovered through the exercise of due diligence:

> Here, by the very nature of the case and the sexual abuse claims leveled against the applicant by his younger family member, there can be no doubt that he would have known about his own involvement or non-involvement in the alleged sexual acts against his family member. He would have known what the victim or any other witness would or would not testify to if the case were to proceed to jury trial. He would have known that the victim's father was prepared to testify that he caught the applicant in the act with his pants down, penis exposed, and kneeling right behind the bare anus of the victim in the bedroom. He would have known that the victim had given a recorded interview to Mercy CAC stating that the sexual acts did in fact occur. All of this would have been readily available to the applicant at the time of his plea of guilty and subsequent conviction and

as such he would have known about the veracity of said statements.

I agree.

"[T]he objective of the escape clause of section 822.3 is to provide relief from the limitation period when an applicant had 'no opportunity' to assert the claim before the limitation period expired." *Cornell v. State*, 529 N.W.2d 606, 611 (Iowa Ct. App. 1994) (quoting *Wilkins*, 522 N.W.2d at 823–24). "[T]he focus of our inquiry has been whether the applicant was or should have been 'alerted' to the potential claim before the limitation period expired." *Id.* (quoting *Wilkins*, 522 N.W.2d at 824).[10] Schmidt was alerted to his own actual-innocence claim and chose to abandon it by pleading guilty. He knew when he entered his plea whether Peter and B.C. were telling the truth and gave up his right to a trial to cross-examine them.

This is not a case in which a new, disinterested witness has come forward. *See State v. Burgess*, 237 Iowa 162, 164–65, 21 N.W.2d 309, 310 (1946) (allowing new trial based on subsequent discovery of disinterested alibi witness, a train conductor, when the defendant "was the only witness who testified at the trial that he was on the train at the time the state's witnesses testified the crime was committed [elsewhere, because c]learly the evidence of the conductor of the train, placing the

---

[10]Exculpatory evidence known but unavailable to the defendant at the time of his original conviction is not considered "newly discovered" when it becomes available years later. *See Jones v. Scurr*, 316 N.W.2d 905, 910 (Iowa 1982). In that case, one codefendant took the Fifth Amendment and another was a fugitive when Rubin Jones was convicted of first-degree murder in a jury trial in 1976. *Id.* at 906–07. Years later, both codefendants came forward with exculpatory evidence. *Id.* The district court denied postconviction relief, and we affirmed, holding the codefendants' exculpatory statements "although unavailable, [were] known to defendant, and cannot be considered newly discovered." *Id.* at 910. We noted Jones had failed to exercise due diligence to secure their testimony at his trial. *Id.* at 910 n.1. Similarly, Schmidt knew what B.C. knew and could have gone to trial and cross-examined B.C. but chose not to do so.

[defendant] on the train at the time of the commission of the crime, was not cumulative"). And this is not the case of a mere he-said, he-said account without another witness to the incident.[11] Peter walked in on and witnessed Schmidt's attempted assault on B.C.

Nor has Schmidt come forward with new physical evidence or new scientific developments that were previously undiscovered.[12] *See More v. State*, 880 N.W.2d 487, 508 (Iowa 2016) (considering as newly discovered evidence FBI announcement that previous testimony on bullet identification was "not scientifically supportable").

B.C.'s recantation is "not new evidence in the real sense." *Compiano*, 261 Iowa at 517, 154 N.W.2d at 849. "On the contrary, it is but an assertion by affidavit that the former testimony given by the

---

[11]By contrast, the Arizona Court of Appeals affirmed a trial court ruling allowing the defendant to withdraw his *Alford* plea in an *unwitnessed* sexual assault based on the victim's recantation, which the trial court found credible in an evidentiary hearing. *State v. Fritz*, 755 P.2d 444, 446 (Ariz. Ct. App. 1988). "[T]he victim stated that he had lied about his accusations and had acted under duress from someone seeking revenge against the defendant." *Id.* The appellate court noted that "[i]f the sole basis for the strength of the state's case is the credibility of the victim, as is usually the case in non-witnessed sexual assaults . . . the trial court does not abuse its discretion by allowing a plea to be withdrawn [so] that the victim's credibility [can] be tested in the crucible of trial." *Id.*

[12]When new DNA evidence is discovered, the defendant may proceed under Iowa Code section 81.10, which provides in relevant part,

> 1. A defendant who has been convicted of a felony or aggravated misdemeanor and who has not been required to submit a DNA sample for DNA profiling may make a motion to the court for an order to require that DNA analysis be performed on evidence collected in the case for which the person stands convicted.
>
> . . . .
>
> 9. Results of DNA analysis conducted pursuant to this section shall be reported to the parties and to the court and may be provided to the board of parole, department of corrections, and criminal and juvenile justice agencies, as defined in section 692.1, for use in the course of investigations and prosecutions, and for consideration in connection with requests for parole, pardon, reprieve, and commutation.

*Id.* § 81.10(1), (9).

witness was false." *Id.*; *see also Taylor*, 287 N.W.2d at 578 (same). As the Kansas Court of Appeals stated,

> By entering a plea of guilty, Woods was well aware of the facts of the case. In fact, he knew the extent of his involvement in the events of the evening better than anyone else. Based on the preliminary hearing, the pretrial motions filed with the court, and the documents exchanged by the parties, Woods knew that at least on the planned day of trial . . . some witnesses were going to testify on his behalf and some were not. He freely and voluntarily chose not to take his chances with a trial. The fact that at some point on or after [the trial date], some—though not all—witnesses appear to have recanted previous incriminating statements or returned to original statements does not change the fact that Woods decided not to risk the consequences of facing a trial . . . .

*Woods*, 379 P.3d at 1141.

Our decision in *Harrington*, 659 N.W.2d 509, does not require a different result. In *Harrington*, we stated that newly discovered, previously undisclosed police reports together with recantations by three trial witnesses qualified as a ground of fact that could not have been raised within the three-year window. 659 N.W.2d at 521. A jury found Terry Harrington guilty of murder in 1978. *Id.* at 514. Harrington had presented an alibi defense at trial that was undermined by several witnesses who placed him with accomplices on the night of the murder. *Id.* at 515. Over twenty years later, Harrington filed an application for postconviction relief. *Id.* Three witnesses had come forward, recanting their trial testimony that placed him with accomplices. *Id.* at 516–17. One recanting witness "claim[ed] he gave a contrary story at trial because he was pressured by the prosecutors and police." *Id.* at 517. Another "said he lied [at trial] to obtain a $5000 reward . . . and to avoid being charged with the crime." *Id.* Harrington's counsel also discovered *Brady* violations—eight police reports containing exculpatory information

withheld by the state.[13]  *Id.* at 518–19.  "Harrington argued this newly discovered evidence warranted vacation of his conviction."  *Id.* at 518.  Concluding we were bound by the district court's factual findings, we stated,

> With respect to both the undisclosed police reports and the recantation evidence, the [district] court held, in ruling on Harrington's substantive claims, that he had proved they were discovered after the verdict in his criminal trial and that they could not have been discovered earlier than they were discovered in the exercise of due diligence.  These findings are clearly supported by substantial evidence, which we have reviewed above, and so are binding under the standard of review applicable to the statute-of-limitations issue.

*Id.* at 521.  We concluded Harrington's PCR application was not time-barred, *see id.*, but went on to determine the *Brady* violations alone entitled him to a new trial, *id.* at 525.

*Harrington* is distinguishable.  Schmidt alleges no *Brady* violations.  No unrecanting eyewitness caught Harrington in the criminal act.  The district court made no finding B.C.'s recantation was newly discovered evidence.  And B.C. makes no claim he was paid or pressured to testify falsely when Schmidt was charged.  Most significantly, unlike Schmidt, Harrington did not plead guilty but steadfastly maintained his innocence.  *Id.* at 523 & n.10.

## IV.  Schmidt's Actual-Innocence Claim Fails.

The majority today adopts for the first time a freestanding actual-innocence claim for postconviction relief.  Under this new standard,

> [f]or an applicant to succeed on a freestanding actual-innocence claim, the applicant must show by clear and convincing evidence that, despite the evidence of guilt supporting the conviction, no reasonable fact finder could convict the applicant of the crimes for which the sentencing

---

[13]*See Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963).

court found the applicant guilty in light of all the evidence, including the newly discovered evidence.

In my view, Schmidt fails to meet this standard as a matter of law.

The Supreme Court has stated that an applicant claiming actual innocence must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S. Ct. 851, 865 (1995). Requiring new reliable evidence significantly reduces "[t]he threat to judicial resources, finality, and comity posed by claims of actual innocence." *Id.* at 324, 115 S. Ct. at 866. Assessing reliability, "the court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Id.* at 332, 115 S. Ct. at 869.

Moreover, to succeed on an actual-innocence claim, the applicant also must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 2649 (1986). The court must therefore assess the merits of the claim, considering " 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.' " *House v. Bell*, 547 U.S. 518, 538, 126 S. Ct. 2064, 2077 (2006) (quoting *Schlup*, 513 U.S. at 327–28, 115 S. Ct. at 867). Most importantly, the applicant must show it is "more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 556, 126 S. Ct. at 2087 (Roberts, C.J., concurring in part and dissenting in part) (quoting *Schlup*, 513 U.S. at 327, 115 S. Ct. at 867). This requires more than a showing that "reasonable doubt exists in the light of the new evidence." *Schlup*, 513 U.S. at 329, 115

S. Ct. at 868. Rather, the applicant must prove "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* This standard is "demanding and permits review only in the 'extraordinary' case." *House*, 547 U.S. at 538, 126 S. Ct. at 2077 (majority opinion) (quoting *Schlup*, 513 U.S. at 327, 115 S. Ct. at 867). Because the inquiry "involves evidence the trial [court] did not have before it, the inquiry requires the . . . court to assess how reasonable jurors would [have] react[ed] to the overall, newly supplemented record." *Id.* at 538, 126 S. Ct. at 2078.

Schmidt cannot show it is more likely than not in light of B.C.'s recantation that no reasonable juror would have convicted him. Peter personally witnessed Schmidt's attempt to sexually assault B.C., literally catching them with their pants down. Police officers took contemporaneous statements from Peter and B.C. at the scene within minutes of the incident. The police officers could have testified as to what B.C. and Peter described minutes after the incident under the excited utterance exception to the hearsay rule. *See* Iowa R. Evid. 5.803(2) (defining excited utterance as "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused"); *see also State v. Richards*, 809 N.W.2d 80, 95 (Iowa 2012) (holding domestic violence victim's statement to daughter about choking while victim's neck was still red was admissible as an excited utterance). Moreover, B.C. gave a recorded forensic interview five days later in which he detailed the events of the night and disclosed Schmidt's past assaults. That video, recorded while his memory was fresh, could be used to impeach his subsequent recantation. *See* Iowa R. Evid. 5.613(*b*) ("Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is

given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires."); *see also State v. Austin*, 585 N.W.2d 241, 243–44 (Iowa 1998) (concluding district court properly admitted videotape of child victim describing sexual abuse recorded shortly after it occurred, when defense counsel opened the door by cross-examining the child about inconsistent statements); *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) (en banc) (allowing jury to consider recorded statement of child discussing abuse despite child's recantation at trial); *State v. Church*, 708 A.2d 1341, 1342 (Vt. 1998) (allowing state to present rehabilitating testimony from witness whom child told she had been abused after defendant attempted to show child had recanted her testimony).

Schmidt's claim of actual innocence in this PCR action must be evaluated in light of that evidence *and,* as the special concurrence acknowledges, Schmidt's guilty-plea colloquy in which he admitted to the facts in the minutes of testimony establishing his crimes. *See Castro*, 795 N.W.2d at 795 (approving use of plea colloquy in summary disposition). Schmidt cannot succeed on his actual-innocence claim based solely on B.C.'s recantation; he cannot show no reasonable juror would convict him. I would hold that the district court properly granted the State's motion for summary dismissal of Schmidt's petition for postconviction relief.

This case falls outside the typical categories of cases of actual innocence. In *Rhoades,* we reviewed a growing body of scholarship on wrongful convictions. 880 N.W.2d at 434–39. Retrospective studies of cases following DNA exonerations found the wrongful convictions "were frequently based upon false confessions obtained from the defendant

[during police interrogations], eyewitness identification that proved to be unreliable, failure of the state to turn over exculpatory evidence, use of unreliable informant testimony, and ineffective assistance of counsel." *Id.* at 435–36 (footnotes omitted). Schmidt alleges none of those.

Most wrongful convictions followed trials in which the defendant (unlike Schmidt) steadfastly maintained his or her innocence.[14] Yet "[t]hirteen percent of all wrongful convictions listed in the National Registry of Exonerations are the result of guilty pleas." *Id.* at 437. We stated, "Many scholars now recognize that at least in some circumstances, an innocent person may rationally decide to plead guilty." *Id.* at 436. Several of those circumstances are inapplicable to Schmidt: pleas to obtain immediate release for time served or pleas based on misunderstanding the elements of the crime or facts alleged. *See id.* at 437. Rather, Schmidt claims he pled guilty to avoid the risk of a thirty-five-year prison sentence. *See id.* at 436 ("[W]hen the deal is good enough, it is rational to refuse to roll the dice . . . regardless of whether

---

[14]See David L. Strauss, *Barbarous Souls* (2010) [hereinafter Strauss], for a chilling example of a life ruined by a pre-*Miranda* interrogation. The book chronicles the story of Darrel Parker, who came home from work in Lincoln, Nebraska, on December 14, 1955, to find his wife, Nancy, strangled in their bed. Police had reason to suspect an ex-convict, Wesley Peery, who had installed a fence at the Parker home the preceding week. *Id.* at 34–35, 98. Nevertheless, police investigator, John Reid, was brought in from Chicago and interrogated the grieving Mr. Parker for hours, using manipulative psychological techniques until he confessed. He recanted the next day and steadfastly maintained his innocence thereafter, but was convicted at trial based on his confession. *See Parker v. Sigler*, 413 F.2d 459, 465–66 (8th Cir. 1969) (holding confession involuntary), *overruled on procedural grounds by Sigler v. Parker*, 396 U.S. 482, 90 S. Ct. 667 (1970). Parker was released in 1970 after serving thirteen years in prison. Strauss, at 216. Peery ultimately confessed to the Nancy Parker murder. *Id.* at 224. Parker is now an eighty-seven-year-old resident of Moline, Illinois. *Id.* at 245.

The Reid interrogation techniques that prompted his false confession in 1955 are described in the Eighth Circuit decision holding Parker's confession to be involuntary, *see Parker*, 413 F.2d at 465, and discussed at length by the *Miranda* Court, *see Miranda v. Arizona*, 384 U.S. 436, 449–58, 86 S. Ct. 1602, 1614–19 (1966). Jacob Schmidt is no Darrel Parker, and today's decision involves no counterpart to John Reid.

one is factually innocent." (quoting Russell D. Covey, *Longitudinal Guilt: Repeat Offenders, Plea Bargaining, and the Variable Standard of Proof*, 63 Fla. L. Rev. 431, 450 (2011))). But, we previously made clear the pressure a defendant faces to plea bargain to avoid a much longer prison sentence does not render his guilty plea involuntary or justify withdrawing a plea based on newly discovered exculpatory evidence. *See Speed*, 573 N.W.2d at 597 ("Speed's concern that he must choose between trial on a murder charge and pleading guilty to a lesser charge has no bearing upon the voluntariness of his plea."). Schmidt's is a poor test case to adopt an actual-innocence pathway to vacating a constitutionally valid guilty plea.

Accordingly, I would not use this case to decide whether to recognize a freestanding or gateway actual-innocence claim under the Iowa Constitution for postconviction-relief actions because under any such test, Schmidt cannot satisfy the showing required for procedural or substantive relief from his guilty plea. Our court should exercise restraint today rather than trying to set the table now for a meritorious actual-innocence claim that may come to us in the future. As we stated in *State v. Keeton*, "fundamental principles of judicial restraint limit our role to deciding each case on the issues presented, and we refrain from deciding issues not presented by the facts." 710 N.W.2d 531, 533–34 (Iowa 2006). I would wait for a case presenting compelling proof of actual innocence before deciding the parameters for allowing postconviction challenges to defect-free guilty pleas. As our court unanimously reiterated in *Keeton*,

> [w]e recognize the law to be an evolving process that often makes the resolution of legal questions a composite of several cases, from which appellate courts can gain a better view of the puzzle before arranging all the pieces. The

wisdom of this process has been revealed time and again, and we continue to subscribe to it today.

*Id.* at 534 (quoting *State v. Williams*, 695 N.W.2d 23, 30 (Iowa 2005)).

For all these reasons, I dissent.

Mansfield and Zager, JJ., join this dissent.

**MANSFIELD, Justice (dissenting).**

I respectfully dissent. Constitutional interpretation is not Darwinian evolution, and a decision of this court today is not superior to the decisions that preceded it just because it is more recent. Whether this court is on a "constitutional march to become better" should be determined by others, not by ourselves.

While it is tempting to agree that "[i]nnocent people should always have a forum to prove their innocence," the realities of any criminal justice system are more complex. Even the majority does not take this statement literally. For example, even the majority accepts for now the limits in Iowa Code chapter 822 on claims brought by those who say they are actually innocent.

I join Justice Waterman's dissent, and write separately only to highlight several points.

First, this case does not involve an actual recantation.

Second, the rule that a guilty plea waives all defenses and objections which are not intrinsic to the plea is both long-standing and sound.

Third, the court has provided no doctrinal basis for grounding an actual-innocence claim in the Iowa Constitution.

Fourth, the court leaves many questions unanswered that will have to be sorted out by our district judges in the coming years.

### I. The Supposed Recantation Is Not a Recantation.

Here is the so-called recantation that is launching a thousand ships:

> I was the victim in [case number]. Jacob Schmidt is my brother. I am currently 23 years of age, but was a child at the time of the criminal case. At the time of the original

> criminal case, I had told various people that Jacob had sexually abused me. When I was 21 years old, I told other people that Jacob had never touched me in a sexual way or sexually abused me. I didn't tell anyone before that date that nothing had really happened, and so Jacob couldn't have known before then. I decided to tell people when I turned 21 since I was a full adult at that time. I want to see my brother and tell him I am sorry that I couldn't tell anyone before then.

This is hardly a recantation. Nowhere does Schmidt's brother *deny* that the sexual assault actually occurred. He merely states that he has recently been *telling* people it didn't occur. Nor does the brother explain why he changed his story.

Just two years ago, in *Estate of Gray ex rel. Gray v. Baldi*, we applied the "contradictory affidavit rule." 880 N.W.2d 451, 463–64 (Iowa 2016). Under this rule, an affidavit that contradicts prior sworn testimony does not create an issue of fact if it "clearly and unambiguously contradicts [the] earlier sworn testimony" unless the affiant offers "a reasonable explanation for any apparent contradiction." *Id.* Since the court purports to be applying civil summary judgment standards, *Estate of Gray* may well indicate that there is no issue of fact here, even if a change in our long-standing law on guilty pleas were appropriate.

**II. We Should Stand by Our Existing Law on the Finality of Guilty Pleas.**

A change in the law is not needed. Our court should adhere to its long-standing rule that "a defendant's guilty plea waives all defenses and objections which are not intrinsic to the plea." *State v. Carroll*, 767 N.W.2d 638, 641 (Iowa 2009).

**A. Our Precedent Is Clear and Well-Settled**. In *Carroll*, we accurately said that this rule is "well-established." *Id.* I would not abandon our settled precedent, unanimously reaffirmed eight years ago

in *Carroll* and two years after that in *State v. Utter*. *See State v. Utter*, 803 N.W.2d 647, 651 (Iowa 2011) (quoting *Carroll* with approval and explaining its significance); *see also Castro v. State*, 795 N.W.2d 789, 792 (Iowa 2011) ("Generally, a criminal defendant waives all defenses and objections to the criminal proceedings by pleading guilty."); *State v. Mattly*, 513 N.W.2d 739, 740–41 (Iowa 1994) (stating that "a valid guilty plea waives all defenses and objections (except that the information or indictment charges no offense or any irregularities intrinsic in the plea itself)"); *State v. Garner*, 469 N.W.2d 698, 699 (Iowa 1991) ("By pleading guilty . . . , Garner waived the right to challenge those convictions on any ground not intrinsic to the pleas."); *State v. Everett*, 372 N.W.2d 235, 237 (Iowa 1985) ("[A] guilty plea would have waived all defenses or objections which were not intrinsic to the plea itself."); *State v. Boge*, 252 N.W.2d 411, 413 (Iowa 1977) ("[B]y entering a plea of guilty, defendant waived any defense or objection which is not intrinsic to the plea itself.").

What does "intrinsic to the plea" mean? It means a defendant who pleads guilty can later argue that the plea was "unintelligent or involuntary." *Carroll*, 767 N.W.2d at 642–44. This includes the situation where the defendant received ineffective assistance of counsel "in connection with the plea." *Id.* at 642. All such matters are intrinsic to the plea. But later-discovered evidence—by definition—is *extrinsic* to the plea.

In *State v. Speed*, 573 N.W.2d 594 (Iowa 1998), we specifically held that new exculpatory evidence is not intrinsic to the plea and cannot be used to challenge a guilty plea. We explained,

> Speed asserts new exculpatory evidence bears upon a defendant's plea because the amount of evidence the State has against a defendant affects the defendant's decision to plead guilty. This argument fails to distinguish between a

defendant's tactical rationale for pleading guilty and a defendant's understanding of what a plea means and his or her choice to voluntarily enter the plea. Any subsequently-discovered deficiency in the State's case that affects a defendant's assessment of the evidence against him, but not the knowing and voluntary nature of the plea, is not intrinsic to the plea itself.

*Id.* at 596.

*State v. Alexander*, 463 N.W.2d 421 (Iowa 1990), likewise reiterated that "a plea of guilty 'waives all defenses or objections which are not intrinsic to the plea itself.'" *Id.* at 422 (quoting *State v. Morehouse*, 316 N.W.2d 884, 885 (Iowa 1982), *overruled on other grounds by State v. Kress*, 636 N.W.2d 12, 20 (Iowa 2001)). In *Alexander*, we relied on this rule to hold that a motion for new trial based on newly discovered evidence was not available for a defendant who had pled guilty. *Id.* at 422–23. We said, "Notions of newly discovered evidence simply have no bearing on a knowing and voluntary admission of guilt." *Id.* at 423.

It is true that *Alexander* contains the following enigmatic sentence at the end of the opinion: "The remedy Alexander seeks is available to him in the form of postconviction relief. *See* Iowa Code § 663A.2(4) (1989) [now Iowa Code § 822.2(1)(*d*) (2014)]." *Id.* The majority seizes on this single sentence to find that a defendant who pleads guilty *can* attack his or her guilty plea in postconviction-relief proceedings under Iowa Code section 822.2(1)(*d*) based on newly discovered evidence.

I am not persuaded. The one-sentence dictum from *Alexander* cannot be right and, indeed, is inconsistent with the rest of the *Alexander* opinion. *See* 463 N.W.2d at 422. One can attack a guilty plea on grounds extrinsic to the plea or one cannot—the case cannot stand for both propositions. Given our many other decisions upholding the rule against extrinsic attacks on a plea, including not just *Alexander* but also decisions that preceded and followed *Alexander,* the stray sentence

from *Alexander* must be regarded as an error. Certainly, it has been treated as a legal dead end. In the nearly thirty years since we decided *Alexander*, that sentence has never been quoted or cited by our court. Instead, for decades, until today, we have consistently followed the rule that a guilty plea waives all defenses and objections which are not intrinsic to the plea.

Westlaw will be busy tracking down and flagging the decisions of our court that, after today, are no longer good law.

**B. Our Precedent Is Sound**. The rule limiting challenges to guilty pleas is not just *our* precedent, it is the *correct* precedent, especially when one considers the interests of both defendants and the state. Although the majority in my view unfairly disparages plea agreements, painting the whole process as predatory, plea negotiations are a vital element of our justice system, and they ultimately *benefit*—and protect—defendants. *See* Susan R. Klein et al., *Waiving the Criminal Justice System: An Empirical and Constitutional Analysis*, 52 Am. Crim. L. Rev. 73, 114 (2015) (noting "that plea agreements are an integral part of the criminal justice system, conserving judicial resources and providing defendants the opportunity to obtain often much-needed reductions in sentences or dismissal of charges in return for a plea and the waivers of all trial rights").

I acknowledge that in the real world, defendants do at times plead guilty to offenses which, in a final reckoning, they did not commit. Typically, there are two reasons why this occurs. One is a strategic decision by the defendant to avoid other, more serious convictions or additional, more severe penalties that would result from going to trial. *See, e.g.*, *State v. Ceretti*, 871 N.W.2d 88, 89 (Iowa 2015) (noting that the defendant was charged with first-degree murder but pled guilty to

voluntary manslaughter, attempted murder, and willful injury causing serious injury). The other is when the defendant committed a crime to which she or he intended to plead guilty but the wrong crime was charged by mistake. *See, e.g., State v. Nall*, 894 N.W.2d 514, 525 (Iowa 2017) ("Under these facts, a factual basis may exist for a charge under section 714.1(6) (theft by check), but not under section 714.1(1)."). Neither of these scenarios calls for the drastic change in the law that the majority has announced today.

The majority cites one case from South Dakota and one case from New York before asking, rhetorically, "What kind of system of justice do we have if we permit actually innocent people to remain in prison?" Despite this sloganeering, the fact remains that both cases involved *defendants who went to trial. See In re Kaufmann*, 157 N.E. 730, 730–31 (N.Y. 1927); *Engesser v. Young*, 856 N.W.2d 471, 473 (S.D. 2014).

Before a defendant pleads guilty, the law protects that defendant in several ways. First, a detailed colloquy is required. *See* Iowa R. Crim. P. 2.8(2)(*b*). The defendant is informed he or she is giving up the right to a trial and there will not be a further trial of any kind. *Id.* r. 2.8(2)(*b*)(4)–(5). Until today, those were true statements.

Second, the record must show a factual basis for each charge to which the defendant is pleading guilty. *See, e.g., Nall*, 894 N.W.2d at 525; *Rhoades v. State*, 848 N.W.2d 22, 33 (Iowa 2014); *State v. Gines*, 844 N.W.2d 437, 441 (Iowa 2014).

Third, as discussed above, the plea must be voluntary and intelligent, and if counsel was ineffective in some manner that rendered the plea involuntary or unintelligent, that can be raised. *See Castro*, 795 N.W.2d at 793–94; *Carroll*, 767 N.W.2d at 642–43.

In my view, these safeguards serve their intended purpose. "Once a defendant has waived his right to a trial by pleading guilty, the State is entitled to expect finality in the conviction." *State v. Mann*, 602 N.W.2d 785, 789 (Iowa 1999); *see also State v. Straw*, 709 N.W.2d 128, 138 (Iowa 2006).

While I expect today's decision to lead to a new wave of applications for postconviction relief, and more work for appointed counsel, prosecutors, and the courts, I do not see the need. Why are the legal grounds already established by this court and the legislature for relief from guilty pleas not enough?[15] Certainly, the present case—involving a fishy nonrecantation by the victim (and no recantation at all by the eyewitness father)—doesn't demonstrate the need.

The majority underplays the critical distinction between defendants who claim actual innocence following a jury trial conviction and those who claim actual innocence following a guilty plea. Most of the decisions cited by the majority involve a defendant who was convicted after a trial. *See Miller v. Comm'r of Corr.*, 700 A.2d 1108, 1110–11 (Conn. 1997); *People v. Washington*, 665 N.E.2d 1330, 1331 (Ill. 1996); *State ex rel. Amrine v. Roper*, 102 S.W.3d 541, 543–44 (Mo. 2003) (en banc); *Montoya v. Ulibarri*, 163 P.3d 476, 478 (N.M. 2007); *In re Kaufmann*, 157 N.E. at 730–31; *Engesser*, 856 N.W.2d at 473. In

---

[15]The majority observes that in 2005, the general assembly enacted legislation that appears to authorize a defendant who has pled guilty, as well as a defendant who was convicted after trial, to seek a court order requiring DNA analysis to be performed on evidence. *See* 2005 Iowa Acts ch. 158, § 10 (codified at Iowa Code § 81.10). Yet the legislation nowhere indicates that a defendant who pled guilty would have a postconviction-relief remedy based on the outcome of such analysis. *See id.* To the contrary, this law was enacted when our precedent on finality of guilty pleas was already well-established. I trust in our executive branch to do the right thing in the event a person who pled guilty were to be fully exonerated by DNA evidence. I presume the legislature in 2005 had the same level of trust. This is a far cry from allowing a nonrecanting recantation to disturb a guilty plea.

*Jamison v. State*, 765 S.E.2d 123, 130 (S.C. 2014), the Supreme Court of South Carolina did open the door to actual-innocence claims by persons who had pled guilty but it established a very high burden for them—one the majority characterizes as "too stringent." Also, in *People v. Tiger*, 48 N.Y.S.3d 685, 700–01 (App. Div. 2017), the court recognized an actual-innocence claim by a defendant who had pled guilty, although New York's highest court has clearly not gone that far, *see People v. Plunkett*, 971 N.E.2d 363, 366 (N.Y. 2012) ("Consistently, we have deemed appellate claims challenging what is competently and independently established by a plea forfeited."); *see also People v. DePerno*, 51 N.Y.S.3d 641, 643 (App. Div. 2017) (finding by a different department of the appellate division that an actual-innocence claim after a guilty plea was foreclosed). The majority also discusses *Ex parte Tuley*, 109 S.W.3d 388, 393 (Tex. Crim. App. 2002), a 5–4 Texas decision that opened the door to actual-innocence claims following a guilty plea, and *People v. Schneider*, 25 P.3d 755, 757 (Colo. 2001) (en banc), a Colorado decision that did the same.

Iowa is not alone in giving finality to guilty pleas notwithstanding claims of actual innocence. *See, e.g., Williams v. State*, 530 S.W.3d 844, 846 (Ark. 2017) ("Williams's argument that he is actually innocent of the offense to which he pleaded guilty does not establish a ground for the writ because it constitutes a direct attack on the judgment."); *Norris v. State*, 896 N.E.2d 1149, 1153 (Ind. 2008) (rejecting an actual innocence claim and stating that "[a] plea of guilty thus forecloses a post-conviction challenge to the facts adjudicated by the trial court's acceptance of the guilty plea and resulting conviction"); *Woods v. State*, 379 P.3d 1134, 1142 (Kan. Ct. App. 2016) (stating that a claim of actual innocence is "insufficient to override the longstanding rule that a freely and

voluntarily entered guilty plea bars a collateral attack on the sufficiency of the evidence").

One should also read the articles cited by the majority. One of the articles is written by a senior federal judge and another by a former federal judge. Jed S. Rakoff, *Why Innocent People Plead Guilty*, N.Y. Rev. Books (Nov. 20, 2014), www.nybooks.com/articles/2014/11/20/why-innocent-people-plead-guilty/[https://perma.cc/LT8T–XKAV]; H. Lee Sarokin, *Why Do Innocent People Plead Guilty?*, Huffington Post (May 29, 2012, 4:39 PM), https://www.huffingtonpost.com/judge-h-lee-sarokin/innocent-people-guilty-pleas_b_1553239.html/[https://perma.cc/6PSQ–6ZW4]. As participants in the system, the views of these two authors deserve our consideration. Yet neither of these authors recommends today's solution—i.e., a freestanding claim of innocence as a way to challenge guilty pleas. To the contrary, Judge Rakoff advocates "involving judges in the plea-bargaining process," while Mr. Sarokin insists "[t]he only solution is vigilance by all involved."

Reexamining a guilty plea years after the fact is far different from reviewing a trial. Unlike with a case that actually went to trial, no trial transcript can be relied on if the witnesses no longer are around, have forgotten the events, or no longer are motivated to remember them. *See Rhoades*, 880 N.W.2d at 449 (acknowledging the difficulty in accurately determining a claim of actual innocence when there has been a plea bargain and no trial record exists).

Under Maryland law, convicted persons may not petition for a writ of actual innocence if they have pled guilty. Md. Code Ann., Crim. Proc. § 8–301 (West, Westlaw through ch. 1–4 2018 Reg. Sess.). The Maryland Court of Special Appeals has noted,

> Under most circumstances, the facts alleged in a petition for postconviction relief will necessarily, in part, be drawn from the trial record. However, when there was a guilty plea, there is no detailed trial record, no witness testimony, and often there is only a minimal factual investigation on the part of the State and defense counsel. Thus, both the defense's factual quest to establish innocence as well as the State's attempt to refute innocence are hindered by the inherent gaps available in evidence in cases in which the petitioner pled guilty. Petitions stemming from a conviction following a guilty plea should thus be denied.

*Yonga v. State*, 108 A.3d 448, 461 (Md. Ct. Spec. App. 2015) (emphasis omitted) (quoting Nicholas Phillips, Comment, *Innocence and Incarceration: A Comprehensive Review of Maryland's Postconviction DNA Relief Statute and Suggestions for Improvement*, 42 U. Balt. L.F. 65, 93–94 (Fall 2011) (footnotes omitted)), *aff'd*, 130 A.3d 486 (Md. 2016).

Changes in the law intended to benefit defendants can end up harming them. Now that we have allowed guilty pleas to be set aside based on newly discovered evidence, the state has a powerful incentive *not* to accept such pleas, despite the benefits to defendants discussed above. The advantages of a plea from the state's perspective are that it provides certainty, closure, and finality. *See Blackledge v. Allison*, 431 U.S. 63, 71, 97 S. Ct. 1621, 1627–28 (1977). That is why the state is often willing to bargain down the original charges as part of a deal. Take away those advantages, and more cases may go to trial on more charges. *See id.* (noting that the advantages of plea negotiations to judges, prosecutors, and defendants "can be secured . . . only if dispositions by guilty plea are accorded a great measure of finality").

**III. Grounding an Actual-Innocence Claim in the Iowa Constitution Is Highly Problematic.**

The majority maintains that an actual-innocence claim for those who plead guilty is required by the Iowa Constitution, specifically article I, section 9 and article I, section 17. It is noteworthy that Schmidt

barely argues Iowa constitutional law at all and then only in the supplemental brief which we invited.

The majority's constitutional reasoning is thin and, to me, unpersuasive. I begin with article I, section 9, the Iowa due process clause. The majority initially asserts that convicting an actually innocent person violates article I, section 9's constitutional guarantee of substantive due process. According to the majority, it is a matter of *substantive* due process because the violation consists of the mere fact an innocent person has been convicted.

But the majority can't literally mean that—otherwise there would be no limits on actual-innocence claims. Thus, the majority shifts to the position that innocent people need to have *an opportunity* to prove they are innocent. That's a matter of *procedural* due process. Yet our justice system already has many procedures in place to protect innocent people from being convicted. These include the trial, the guilty plea colloquy, the right to counsel, and so forth.

So what the majority is really saying is that the Iowa due process clause requires *one more procedure*, i.e., the one devised today, to protect the innocent from being convicted. Why? Why is one more procedure so important as to be of constitutional dimension? The majority does not explain.

Weaker still is the majority's invocation of article I, section 17. This section prohibits cruel and unusual punishments. Yet the issue before this court is not the punishment for Schmidt's crime, but whether Schmidt should have a new opportunity to prove he didn't commit that crime. Unless we are going to ignore the fundamental distinctions among the different rights within our own constitution, article I, section 17 has no bearing on today's case.

#### IV. The Majority Opinion Results in Many Unanswered Questions.

Having demonstrated enough self-confidence to tear up an established rule of law, the majority now claims to be too modest to tell us what today's decision means. That's not good enough. One way to test the soundness of a decision is to consider the implications of that decision.

Here are a few questions raised by today's decision.

**What does "actual innocence" mean?** The majority opinion is unclear and inconsistent concerning the meaning of "actual innocence." At the end the majority states,

> [T]he applicant must show by clear and convincing evidence that, despite the evidence of guilt supporting the conviction, no reasonable fact finder could convict the applicant of the crimes for which the sentencing court found the applicant guilty in light of all the evidence, including the newly discovered evidence.

Yet earlier, the majority says, "Holding a person who has committed no crime in prison strikes the very essence of the constitutional guarantee of substantive due process." The two statements do not line up. Where are we?

Obviously, at a minimum, the defendant must prove he or she did not commit the crime to which he or she pled guilty. Must the defendant also prove his or her conduct does not amount to a *different* crime (even a much less serious one)? And what if the defendant pled guilty to several charges at once? Must the defendant establish that *none* of the incidents involve a crime committed by that defendant?

**What is "evidence" at the summary judgment stage?** The court directs the parties to provide "other evidence or affidavits" in support of their positions, before the district court rules on the State's motion for summary judgment. What is evidence? The majority indicates that the

requirements of rule 1.981 apply. In that event, do minutes of testimony count as evidence, even if the defendant did not previously acknowledge they were true? The special concurrence seems to indicate that the minutes are treated as evidence.

**What is "evidence" at the trial stage?** If a claim of actual innocence gets past summary judgment, must all evidence used at the postconviction-relief trial comply with the rules of evidence? Again, what's the status of minutes of testimony?

**If the normal rules of evidence for summary judgment and trial proceedings do not apply, how does the district court handle the resulting apples-to-oranges comparisons?** If minutes of testimony are allowed as evidence, what weight are they given? How are they compared to affidavits and live testimony?

**Does a defendant need to do anything other than deny his or her guilt to raise an actual-innocence claim and start the process?** According to the court, a freestanding actual-innocence claim can be brought under Iowa Code section 822.2(1)(*a*). But if a claim of innocence by itself is enough, the defendant doesn't need a recantation or other allegedly new evidence, unless the three-year time bar has passed. *See* Iowa Code § 822.3. A mere denial of guilt is enough to get new counsel appointed and get the ball rolling.

**What is the role of the defendant's guilty plea counsel?** Typically, a claim of ineffective assistance of counsel waives the attorney–client privilege. *See* Iowa R. Prof'l Conduct 32:1.6(b)(5). So, when the defendant claims to have received ineffective assistance in connection with a plea, former counsel can testify about his or her communications with the defendant concerning the plea. These communications may have information bearing on the defendant's actual innocence. Is such

testimony now off-limits, since the defendant can challenge the guilty plea without having to argue ineffective assistance of counsel?

**What about *Alford* pleas?** An *Alford* plea "was designed to permit a defendant to make a voluntary and intelligent decision to plead guilty to a crime without admitting participation in the underlying facts which constitute the crime." *State v. Klawonn*, 609 N.W.2d 515, 520 (Iowa 2000) (citing *North Carolina v. Alford*, 400 U.S. 25, 37–38, 91 S. Ct. 160, 167–68 (1970)). With an *Alford* plea, the defendant "claim[s] innocence" but makes a "cost–benefit analysis of avoiding the risks associated with a trial." *Id.* at 520–21. After today, does someone who made an *Alford* plea now get to raise an actual-innocence claim? That seems strange. After all, nothing has changed. Such a defendant always maintained he or she was innocent. Or are *Alford* pleas now unconstitutional in light of today's decision?

**If the defendant succeeds, can other charges be reinstated?** Part of the established remedy when setting aside a guilty plea is to reinstate all charges dismissed as part of any plea bargain. *See State v. Weitzel*, 905 N.W.2d 397, 411 (Iowa 2017) (allowing the state to "reinstate any charges dismissed in contemplation of a valid plea bargain"); *Gines*, 844 N.W.2d at 442 ("[W]e must put the State back in the position it was in before making the plea agreement."); *see also Ceretti*, 871 N.W.2d at 97; *State v. Allen*, 708 N.W.2d 361, 369 (Iowa 2006). So, if the defendant establishes actual innocence and there was a plea bargain, does the state get to reinstate other charges that were dismissed?

The majority refuses to consider issues like these because it doesn't want to get into the merits of the case. But none of these matters goes to the actual merits. Some of them were discussed in the supplemental briefing invited by this court. If our court is going to

change the law, it should clarify the change as much as possible and not leave it to district courts to play a game of twenty questions. In other decisions, we have given "protocols" to our district courts. *See, e.g., State v. Harrington*, 893 N.W.2d 36, 45–46 (Iowa 2017) (describing a "protocol" to use in the future); *State v. Dahl*, 874 N.W.2d 348, 353 (Iowa 2016) (same); *Fagen v. Grand View Univ.*, 861 N.W.2d 825, 828 (Iowa 2015) (plurality opinion) (same); *State v. Cashen*, 789 N.W.2d 400, 403 (Iowa 2010) (same), *superseded by statute*, 2011 Iowa Acts ch. 8, § 2 (codified at Iowa Code § 622.10).

## V. Conclusion.

From the State's perspective, I am guessing it would have simply preferred to try Schmidt all those years ago. In the long run, I am doubtful today's decision will benefit defendants. More importantly, today's decision needlessly overturns an established rule of law that was fair to all parties and worked well.

Waterman and Zager, JJ., join this dissent.